FRANCIS FLETCHER, PERSONAL REPRESENTATIVE OF THE ESTATE OF BLANCHE FLETCHER PETERSEN, DECEASED, APPELLEE AND CROSS-APPELLANT, V. PAUL MATHEW, APPELLANT AND CROSS-APPELLEE, FIRST NATIONAL BANK AND TRUST CO. OF KEARNEY ET AL., APPELLEES.

448 N.W.2d 576

Filed December 1, 1989.    No. 87-1116.

Michael M. O'Brien, of Matthews & Cannon, P.C., for appellant.

Terri S. Harder, of Jacobsen, Orr, Nelson & Wright, P.C., for appellee Fletcher.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, and FAHRNBRUCH, JJ., and COLWELL, D.J., Retired.

HASTINGS, C.J.

The defendant Paul Mathew has appealed a judgment of $590,165.04 in favor of Francis Fletcher, personal representative of the estate of Blanche Fletcher Petersen, deceased. This judgment was entered by the district court on plaintiff's petition alleging fraud and undue influence and praying for an accounting.

The gist of plaintiff's action is that Mathew began manipulating Petersen's financial affairs in the early part of 1981. As a result, it is alleged, by creating certificates of deposit (CD's) in the names of Mathew and Petersen and by various cash transfers accomplished by means of a power of attorney

granted defendant by Petersen, Mathew was able to acquire in his own name approximately $500,000 of Petersen's money.

In an appeal of an equity action, this court tries the factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, where credible evidence is in conflict on a material issue of fact, we consider and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *State ex rel. Spire v. Northwestern Bell Tel. Co., ante* p. 262, 445 N.W.2d 284 (1989).

Defendant's assignments of error may be consolidated into two: (1) The plaintiff failed to establish by clear and convincing evidence the elements of fraud, and (2) the court erred in awarding prejudgment interest. In his cross-appeal, plaintiff alleges that the trial court erred by failing to find that defendant's acquisition of Petersen's money was the result of undue influence. We would note at the outset that the trial court's judgment was based on a general finding in favor of the plaintiff. No reference was made in the journal entry as to whether the decision was based on fraud or undue influence. Therefore, because we review this matter de novo on the record, we will affirm if the record supports either theory of recovery.

Mathew was an attorney who had practiced law in Loup City, Nebraska, for over 45 years. He had known the decedent, Petersen, since he was a child.

About 1974, Mathew began to assist Petersen in her daily affairs. At this time, his assistance involved bringing her the mail, social visits, and occasionally driving her to various places.

After suffering a stroke about 10 years before her death, Petersen was hospitalized at the Loup City hospital. From that time until her death on March 21, 1985, she resided at the hospital.

Petersen was 96 years of age at the time of her death. She had no close relatives. Other than Mathew, no one visited her on a regular basis.

According to Mathew's testimony, he began to handle Petersen's financial affairs about 6 months before her stroke. On March 27, 1981, Petersen signed a power of attorney

designating Mathew as her attorney in fact. At that time, Petersen was 92 years of age. During the last several years of Petersen's life, Mathew engaged in numerous activities involving Petersen's money, other property, and personal affairs.

These services included management of Petersen's real estate properties in Nebraska and Kansas (which appear to number six and would produce total annual income of approximately $18,000); personal care such as daily visits, taking her on drives, overseeing her medical attention, and providing flowers and gifts to Petersen and others on special occasions, with her money; and business details such as bookkeeping, correspondence, receipt of income, payment of bills, and, in particular, the depositing of moneys in CD's in the names of both Petersen and Mathew.

Mathew also represented Petersen as her attorney, for which he was paid, in recent years at least, $20,000 by checks drawn on her account written and signed by Mathew.

There was testimony by Mathew and his secretary that Mathew devoted an average of 6 hours per day and his office staff an average of 4 to 5 hours per day in the handling of Petersen's personal and business affairs. However, the supporting evidence to those conclusions was woefully weak.

In the beginning, Mathew would take CD's which were in Petersen's name alone and which were paying only 4 to 7 percent interest and would borrow against them at what he said was 2 percent interest. He would then invest those funds in new CD's paying up to 15 percent which would be placed in both his and Petersen's names. Additional joint CD's were purchased from funds which, according to Mathew, represented the profits, i.e., the money left over each year from Petersen's income after paying her expenses. These CD's, which Mathew transferred to his own account upon Petersen's death, totaled $333,018.17. Additionally, there was a total of $154,676.77 belonging to Petersen which was transferred to Mathew or to Hart of Nebraska, a corporation of which Mathew claimed to be president.

Mathew's explanations of how he came into this money varied. He claimed that it was a gift, that it was for legal fees,

that it was for financial advice, that it was the neighborly thing to do, or that it was just the result of a whim of Petersen's.

According to Mathew's testimony:

> It [the money] piled up fast, boy; it was making money. In those good years, I said, Blanche, what are you going to do with all of this? She said, I might take it with me. I said, that wouldn't be very nice. Why don't we buy some more money markets. If you outlive me, you get it all, and if I outlive you, I get just a small part of it.

At another point in his testimony, Mathew stated with regard to the oral agreement he claimed he made with Petersen:

> The agreement was — I said, Blanche, it's taking a lot of time. I can't afford to spend my time with you, but I will go ahead and see to it that you stay in the hospital, and that we will keep our balances down. But I want my name with your name on all of the profit CDs.

Mathew also told Petersen that either his name was going to be on the CD's or he was not going to represent her anymore. This agreement which Mathew contends he made with Petersen was explained by him in court on about 16 different occasions. Most of the time he said the agreement to place all of those CD's in both of their names was in satisfaction of his services to her. However, he also stated that they were gifts to him. In a separate action seeking fees, his petition alleged that the agreement was that for the management of her assets, he was to receive *one-half* of the profits. When asked about exhibit 2, which indicates that after Petersen's death Mathew received $333,018.17 from CD's in the names of both Petersen and Mathew, he said that was for the work which he did. Specifically, he said, "Well, we agreed that she would pay $460,000 for all of our work." Mathew also admitted that there were no time records kept; he was to be paid for the profits that were made. The record indicates that the agreement was that "whoever lived the longest would get that money." Mathew also testified that at the time the agreement came about, Petersen had told him that she wanted to give him

> the whole works . . . the land, all the buildings, and all the money and everything she owned. . . . She wanted me to move into her house. She would give me the house. But I

was afraid if she did, she'd walk over to that house from the hospital. It's only a block away. She didn't belong living in a house.

At another point in his testimony, Mathew said, "She wanted — she wanted me to have the whole estate. I said, Blanche, I don't need it, but I would — I do think that I should be entitled to the profits, and she agreed with me on it." Mathew also stated in answer to another question about the agreement: "If I died before she did, I got nothing out of it. But if she died before I did, then I was going to get the $40,000 CDs and there was a lot of them." Finally, when asked if the CD's were to repay Mathew for everything he had done for Petersen, he said, "Well, it wasn't a question of pay. It was a question of being neighborly and honest and fair all the way around."

A power of attorney has been defined as "an instrument in writing authorizing another to act as one's agent." *In re Estate of Lienemann*, 222 Neb. 169, 178, 382 N.W.2d 595, 602 (1986).

> Because the power of attorney creates an agency relationship, the authority and duties of an attorney in fact are governed by the principles of the law of agency [citation omitted], including the prohibitions against an agent's profiting . . . or having a personal stake that conflicts with the principal's interest in a transaction in which the agent represents the principal, see *Johnson v. First Nat. Bank*, 253 Ga. 233, 319 S.E.2d 440 (1984).

*In re Estate of Lienemann* at 178, 382 N.W.2d at 602.

An agency is a fiduciary relationship resulting from one person's manifested consent that another may act on behalf and subject to the control of the person manifesting such consent, and further, resulting from another's consent to so act. *Oddo v. Speedway Scaffold Co., ante* p. 1, 443 N.W.2d 596 (1989).

" '[A confidential] relation exists between two persons if one has gained the confidence of the other and purports to act or advise with the other's interest in mind.' " *Schaneman v. Schaneman*, 206 Neb. 113, 125-26, 291 N.W.2d 412, 420 (1980).

The question for determination is whether Mathew, through the instrument of fraud, deprived the estate of Blanche Fletcher Petersen of property to which it was entitled. The general rule applicable is that fraud is never presumed and must be proven

by clear and convincing evidence. *ServiceMaster Indus. v. J.R.L. Enterprises*, 223 Neb. 39, 388 N.W.2d 83 (1986). However, this court has also stated:

> "To prove fraud direct evidence is not always essential. Inferences or presumptions of fraud may be drawn from facts and circumstances. However, such inferences or presumptions must not be guess work or conjecture but must be rational and logical deductions from the facts and circumstances from which they are inferred.

> "What constitutes fraud is a matter of fact in each case.

> . . .

> "In an action in which relief is sought on account of alleged fraud, the existence of a confidential or fiduciary relationship, or status of unequal footing, when shown, does not shift the position of the burden of proving all elements of the fraud alleged, but nevertheless may be sufficient to allow fraud to be found to have existed when in the absence of such a status it could not be so found, and thus to have the effect of placing the burden of going forward with the evidence upon the party charged with fraud. . . ."

*Workman v. Workman*, 174 Neb. 471, 497, 118 N.W.2d 764, 780 (1962).

*ServiceMaster Indus., supra*, also adds, quoting *Rettinger v. Pierpont*, 145 Neb. 161, 15 N.W.2d 393 (1944), "Circumstantial evidence alone is not sufficient to sustain a finding of fraud unless the circumstances ' "are of such a nature and so related to each other that the conclusion reached is the only one that can fairly and reasonably be drawn therefrom." ' " 223 Neb. at 44, 388 N.W.2d at 86.

*Rettinger* also held that the fiduciary bears the burden of proving the fairness of the transaction.

In defending against the fraud charge, Mathew advances the six-point test contained in *English v. Bruin Engineering, Inc.*, 201 Neb. 791, 272 N.W.2d 753 (1978); i.e., that a material representation was made, it was false and known to be false, it was made with the intention that it should be acted upon by another, and it was so acted upon, causing injury or damage to the other. See, also, *Henderson v. Forman*, 231 Neb. 440, 436

N.W.2d 526 (1989). However, that test relates to fraudulent misrepresentations. Fraud in the present instance may be based on agency.

Generally, an agent is required to act solely for the benefit of his or her principal in all matters connected with the agency and adhere faithfully to the instructions of the principal. *Walker Land & Cattle Co. v. Daub*, 223 Neb. 343, 389 N.W.2d 560 (1986). An agent and principal are in a fiduciary relationship such that the agent has an obligation to refrain from doing any harmful act to the principal. *Grone v. Lincoln Mut. Life Ins. Co.*, 230 Neb. 144, 430 N.W.2d 507 (1988).

This court, in *In re Estate of Lienemann*, 222 Neb. 169, 382 N.W.2d 595 (1986), citing *Matter of Estate of Mehus*, 278 N.W.2d 625 (N.D. 1979), and *Johnson v. First Nat. Bank*, 253 Ga. 233, 319 S.E.2d 440 (1984), found that an agent is prohibited from profiting from the agency relationship to the detriment of the principal or having a personal stake that conflicts with the principal's interest in a transaction in which the agent represents the principal.

*Johnson, supra,* involved joint CD's purchased by an attorney in fact and the issue of a right of survivorship. The court there held that the acquisition of survivorship rights by the attorney in fact constituted a profit derived by the agent to the detriment of her principal, that detriment being the removal of funds from the principal's testamentary control. The court also held that the attorney in fact failed to sustain the burden of proving that the principal had ratified the agent's action.

The Supreme Court of South Carolina, in *Fender v. Fender*, 285 S.C. 260, 329 S.E.2d 430 (1985), in discussing an agent's claim that the principal orally authorized transfers to the benefit of the agent and to the detriment of his principal, adopted the following rule to discourage fraud and abuse:

> Effectively, absent express intention, an agent may not utilize his position for his or a third party's personal benefit in a substantially gratuitous transfer. . . .
>
> Appellant seeks to remove himself from the operation of the general rule. He contends that Mr. Fender orally authorized the transfers. Notwithstanding such a claim, we hold today that any purported oral authorization was

ineffective. The power to make any gift must be expressly granted in the instrument itself.

"It is for the common security of mankind . . . 'that gifts procured by agents . . . from their principals, should be scrutinized with a close and vigilant suspicion.' " *Harrison v. Harrison*, 214 Ga. 393, 105 S.E.2d 214, 218 (1958). Therefore, in order to avoid fraud and abuse, we adopt a rule barring a gift by an attorney in fact to himself or a third party absent clear intent to the contrary . . . .

*Fender* at 262, 329 S.E.2d at 431.

We recognize the wisdom of such a rule and hereby adopt it to govern the relationship between attorney in fact and principal. Powers of attorney are by necessity strictly construed, and broad encompassing grants of power are to be discounted. 3 Am. Jur. 2d *Agency* §§ 31 and 32 (1986).

Applying these precepts to the facts at hand, we note that Mathew, by converting the joint accounts into his own accounts, has profited and Petersen has suffered a detriment in the removal of those funds from her testamentary control.

The power of attorney granted Mathew the following powers:

Know all men by these presents, that I, the undersigned, Blanche Petersen, of Loup City, in the County of Sherman, State of Nebraska, have made, constituted and appointed, and by these presents, do make, constitute and appoint Paul Mathew, of Loup City, in the County of Sherman, State of Nebraska, my true and lawful attorney in fact, for me and in my name and stead, and to my use, to Endorse Checks and Deposit Proceeds, to Change my C.D. Funds to Cash or to Money Fund Certificates, to Collect Debts and Recover Debts in Another State, to Receive a Legacy, to Make Partition of and Recover an Estate, to Sale [sic] and Conveyance [sic] of Real Estate, also the Power to Sell and Convey Real Estate, the Power to Sell Lands in Another State, the Granting Power to Mortgage, to Lease Premises and to Manage my Investments, hereby giving unto my said attorney in fact, full authority and power to do everything whatsoever requisite or necessary to be done in the premises, as fully

as I could or might do if personally present, with full power of substitution and revocation, hereby confirming and ratifying all that my said attorney in fact shall lawfully do or cause to be done, hereunder.

There is no language in the foregoing instrument that empowered Mathew to convert funds to his own use or to make gifts to himself from Petersen's funds. He had used his position to influence Petersen to allow such gifts to be made if in fact she did allow it. He admitted that if he did not visit Petersen she would not eat. He told her that his name would have to be on the CD's or he would not represent her anymore.

In terms of fairness and credibility, the age difference between Mathew and Petersen in light of the survivorship arrangement, Petersen's health, her apparent dependency on Mathew, and the comparison of her 11th grade education with his training and status as a lawyer, as well as Mathew's claim that the records were simply lost, his rather weak explanations of other facets of his relationship with Petersen, and his equivocal and changing explanations of the financial arrangements, are all factors which must be considered by the court.

Plaintiff has made out a prima facie case of fraud. In light of the fiduciary relationship, the burden of going forward with the evidence fell upon the shoulders of Mathew. The trial court did not believe that he had met that burden and neither do we.

Regarding the issue of prejudgment interest, the rule is adequately set forth in *Hill v. City of Lincoln*, 221 Neb. 719, 723, 380 N.W.2d 296, 299 (1986), where this court said: "Prejudgment interest may be recovered on claims which are liquidated. A claim is liquidated if the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance upon opinion or discretion."

Mathew stipulated prior to trial that he had acquired $333,018.17 from the jointly titled CD's belonging to Petersen and him. An additional $154,676.77 included within the court's judgment was for items identified precisely and without question by the computations of the accountant, which in turn were based on records of CD's and canceled checks.

Since the damages were liquidated and no reasonable

controversy existed, the plaintiff was entitled to prejudgment interest as a matter of law. *First Data Resources, Inc. v. Omaha Steaks Int., Inc.*, 209 Neb. 327, 307 N.W.2d 790 (1981). This amounted to $104,995.68 from the date of Petersen's death to the date of the judgment at the rate of 7.64 percent, as provided by Neb. Rev. Stat. § 45-103 (Reissue 1988). This action predated the rule in *Knox v. Cook, ante* p. 387, 446 N.W.2d 1 (1989).

The judgment, therefore, should be modified to provide a total recovery of $592,690.62, and as modified it is affirmed.

AFFIRMED AS MODIFIED.