HOME FEDERAL SAVINGS AND LOAN ASSOCIATION OF GRAND ISLAND, A SAVINGS AND LOAN ASSOCIATION, APPELLEE, V. MCDERMOTT & MILLER, A PARTNERSHIP, ET AL., APPELLANTS.

449 N.W.2d 12

Filed December 8, 1989.   No. 88-261.

Les Seiler, of Brock, Seiler & Smith, for appellants.

Daniel M. Placzek, of Luebs, Dowding, Beltzer, Leininger, Smith & Busick, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

This is a suit on a security agreement Martin Chapman executed in favor of plaintiff-appellee, Home Federal Savings and Loan Association of Grand Island, and in connection with which he assigned to Home Federal sums to become due him from defendants-appellants, McDermott & Miller, a partnership, McDermott & Miller, P.C., a professional corporation, and Integrated Computer Concepts, Inc., a business corporation. Following a bench trial, the district court entered judgment in favor of Home Federal and against the

partnership. For reasons which are not explained by the record, the district court made no ruling with respect to either the professional corporation or the business corporation, this notwithstanding the fact that its failure to do so was specifically called to the district court's attention in defendants' motion for new trial. Nonetheless, all three defendants have appealed to this court. Since, as to the professional and business corporations, the suit remains under submission to the district court, the appeal as to them is dismissed as premature. For this reason, the practice of deciding only part of a case is disapproved. The assignment of error which remains operative is the partnership's claim that the district court should have found that Chapman's assignment to Home Federal was invalid. For the reasons which follow, the judgment of the district court against the partnership is affirmed as modified.

Although the professional and business corporations are not parties to this appeal, they are integral parts of the transactions which give rise to this suit. Thus, their role is discussed to the extent necessary to resolve the partnership's assignment of error.

The partnership is composed of Curtis Griess, Niels McDermott, Robert Miller, and Martin Chapman, and was engaged in the practice of accounting and the business of processing data. On January 2, 1979, the partnership sold its accounting practice to the professional corporation and on the same date sold its data processing business to the business corporation, which was originally called McDermott and Miller, EDP, Inc.

The initial shareholders of the professional corporation were the four members of the partnership and three individuals who had been previously employed by it. These seven individuals apparently also comprised the initial shareholders of the business corporation, but the record is not entirely clear in this regard. The business corporation changed its original name to W.O.R.K., Inc., which changed its name to Integrated Computer Concepts, Inc. Integrated subsequently sold its assets to the professional corporation and was thereafter dissolved.

The January 2, 1979, installment sale agreement with respect

to the sale of the accounting practice by the partnership to the professional corporation set the price of the accounting practice at $1,066,763 and called for a $240,000 downpayment, with the remaining $826,673 to be paid in 120 monthly installments of an amount sufficient to fully amortize the unpaid balance, including interest at a rate of 9 percent per annum. This contract called for interest payments in March, April, and May of 1979, and 120 monthly payments of $10,472 commencing July 1, 1979.

The January 2, 1979, installment sale agreement with respect to the sale of the data processing business by the partnership to the business corporation set the price of the data processing business at $216,252 and called for a $48,600 downpayment, with the remaining $167,652 to be paid in 120 monthly installments of an amount sufficient to fully amortize the unpaid balance, including interest at the rate of 9 percent per annum. This contract called for interest payments in March, April, and May of 1979, and 120 monthly payments of $2,123.78 commencing July 1, 1979.

After purchasing the business corporation's assets, the professional corporation assumed the monthly payments the business corporation had been required to make under its January 2, 1979, contract to purchase the data processing business. These payments were made through July 1987, after which the professional corporation ceased making contract payments.

Early in 1981, one of the partners, Martin Chapman, experienced financial problems. As a result, Chapman negotiated an agreement causing the professional corporation to accelerate its payments due the partnership under the January 2, 1979, accounting practice sale agreement. This accelerated payment agreement between Chapman, the partnership, and the professional corporation required the professional corporation to make prepayments of $15,000 on February 13, 1981, and $42,500 on May 1, 1981; required the partnership to distribute these prepayments to Chapman; and required Chapman to use these prepayments to reduce his indebtedness at Overland National Bank and Commercial National Bank, both of Grand Island, Nebraska.

The accelerated payment agreement also provides the following:

> This Agreement shall be binding upon the heirs, successors, and assigns of the parties hereto, and shall inure to their benefit likewise. CHAPMAN agrees not to make any assignments of this Agreement or Exhibit "A" without the express written consent of [the professional corporation] and [the partnership] nor shall he pledge this Agreement or Exhibit "A" as collateral security without the express written consent of [the professional corporation] and [the partnership].

The "Exhibit 'A' " referenced in the foregoing quotation is apparently the January 2, 1979, accounting practice sale agreement between the partnership and the professional corporation, which is mentioned in the recitals portion of the accelerated payment agreement. The accelerated payment agreement does not affect the data processing business sale agreement.

On May 27, 1983, Home Federal loaned Chapman $35,000. Home Federal advanced an additional $10,000 on November 7, 1983, and on November 29, 1983, both notes were renewed in the form of one $45,000 note. This $45,000 note was again renewed on June 11, 1984. The June 11, 1984, note recites that it "is a renewal of a Financing Statement and Note dated May 27, 1983, and which statement was filed with the Hall County Clerk April 13, 1984 to secure said payment of a $45,000.00 loan."

The security agreement/financing statement which accompanies the June 11, 1984, note is dated April 4, 1984, and lists as collateral, among other things, contract receivables from the professional corporation and the business corporation "subject to the present assignment held by Commercial National Bank & Trust Company." Home Federal also filed a financing statement with the Secretary of State; while we cannot be absolutely certain of the date of this filing due to the poor quality of the copy of the document contained in the record, it appears to have been filed on May 9, 1984, and covers Chapman's contract receivables from the professional corporation and the business corporation.

At the time the April 4, 1984, security agreement/financing statement was signed, the partnership was distributing two monthly payments to Commercial National Bank of Grand Island for the benefit of Chapman. These distributions represented Chapman's share of payments received by the partnership under the accounting practice sale agreement and the data processing business sale agreement.

One of these monthly payments was approximately $2,035 per month and represented Chapman's share of the proceeds from the accounting practice sale agreement. The other monthly payment amounted to approximately $465 per month, representing Chapman's share of the installment sale agreement for the sale of the data processing business. Each month, the partnership forwarded each of these payments directly to the bank to reduce amounts owed by Chapman.

On August 1, 1985, Home Federal's counsel sent a letter to the partnership informing it of Home Federal's perfected security interest in Chapman's contract receivables from the partnership and the professional corporation, subject to a prior assignment to Omaha National Bank, the successor in interest to Commercial National Bank. This letter also informed the partnership of Chapman's default and directed the partnership to make future payments to Home Federal.

On that very day, the partnership made three payments to Home Federal, one in the sum of $1,271.02, reflecting Chapman's $2,035.42 share of the regular monthly payment due the partnership under the contract to sell the accounting practice, less $764.40 which represented the final payment under the assignment by Chapman to Omaha National Bank. The other two payments of $472.67 each represented Chapman's share of the July and August 1985 payments to the partnership under the contract to sell the data processing business. Correspondence from partner Griess accompanying these partnership payments stated that the next month's payments would be combined into one check to Home Federal and that Griess would mail future checks to Home Federal as he received payments.

Because of disputes with Chapman, the professional corporation has, since August 1, 1985, withheld payments

which would otherwise have been made to the partnership for Chapman's share of payments arising under the accounting practice installment sale agreement. Consequently, not having received these payments, the partnership has made no distributions to Home Federal.

While the partnership distributed to the other three partners their respective shares of the monthly payments received from the professional corporation after August 1, 1985, for the sale of the data processing business, the partnership has retained Chapman's share of those payments. These retained payments consist of 24 payments of $472.67 each, for a total of $11,344.08.

Griess testified that Chapman's share of these payments was held in escrow by the partnership on the advice of the partnership's attorney after Chapman declared bankruptcy on August 26, 1985. At this point, however, the partnership seems to be holding these payments because of a dispute arising out of an amended employment agreement between Chapman and the professional corporation.

The partnership argues that the district court erred in deciding the case in favor of Home Federal because the accelerated payment agreement specifically prohibits Chapman from assigning or pledging funds receivable under the accounting practice sale agreement without the express written consent of the partnership and professional corporation. However, the answer to this issue is clearly set forth in the Nebraska Uniform Commercial Code.

First, it should be noted that by virtue of its security agreement and financing statement, Home Federal has a perfected security interest in Chapman's contract receivables. This security interest is governed by article 9 of the Uniform Commercial Code. See, Neb. U.C.C. § 9-102 (Reissue 1980) (general applicability of article 9); Neb. U.C.C. § 9-201 (Reissue 1980) (general validity of a security agreement); Neb. U.C.C. § 9-203(1) and (2) (Reissue 1980) (attachment and enforceability of security interests); Neb. U.C.C. § 9-302 (Reissue 1980) (filing to perfect security interest).

The asset which Chapman has pledged to Home Federal is a "general intangible" under Neb. U.C.C. § 9-106 (Reissue

1980), which reads:

> "Account" means any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance. "General intangibles" means any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments, and money. All rights to payment earned or unearned under a charter or other contract involving the use or hire of a vessel and all rights incident to the charter or contract are accounts.

See *Crichton v. Himlie Properties*, 105 Wash. 2d 191, 713 P.2d 108 (1986) (seller's rights under contract for conveyance of real estate held to be a general intangible).

We next note the relevancy of Neb. U.C.C. § 9-318(4) (Reissue 1980), which provides:

> A term in any contract between an account debtor and an assignor is ineffective if it prohibits assignment of an account or prohibits creation of a security interest in a general intangible for money due or to become due or requires the account debtor's consent to such assignment or security interest.

Neb. U.C.C. § 9-105 (Reissue 1980) defines account debtor: "(1) In this article unless the context otherwise requires: (a) 'Account debtor' means the person who is obligated on an account, chattel paper, or general intangible." Furthermore, the term "person" in § 9-105 includes organizations. Neb. U.C.C. § 1-201(30) (Reissue 1980).

Thus, it is clear that § 9-318(4) negated any provision in the February 13, 1981, accelerated payment agreement restricting Chapman from pledging moneys receivable under the accounting practice sale agreement as collateral for his loan from Home Federal.

The partnership offers other affirmative defenses which may be available to the professional corporation. Disputes which the professional corporation may have with Chapman do not affect the partnership's obligation on Chapman's assignment to Home Federal. However, the partnership is not an obligor under the contracts which Chapman has assigned; the

partnership is only an intermediary through which payments it receives from the professional corporation on Chapman's behalf flow to Home Federal. Thus, while the partnership cannot assert defenses which may be available to the professional corporation, neither can the partnership be required to distribute to Home Federal payments it does not receive from the professional corporation. The judgment against the partnership must therefore be reduced to the amount of the undistributed payments it has received from the professional corporation, that is, $11,344.08. Since these damages are liquidated and the cause of action accrued prior to January 1, 1987, *Knox v. Cook*, 233 Neb. 387, 446 N.W.2d 1 (1989), Home Federal is entitled to prejudgment interest, *Fletcher v. Mathew,* 233 Neb. 853, 448 N.W.2d 576 (1989). The judgment of the district court is affirmed as so modified.

Whether Home Federal has established the right to recover from the corporations is a matter, in the first instance, for the district court to resolve on the record already made before it.

APPEAL DISMISSED IN PART, AND IN
PART AFFIRMED AS MODIFIED.