STATE OF NEBRASKA, APPELLEE, v. CONNIE JANSSEN, APPELLANT.
584 N.W. 2d 27

Filed July 21, 1998.    No. A-97-968.

Douglas A. Johnson for appellant.

Don Stenberg, Attorney General, and Jay C. Hinsley for appellee.

HANNON, IRWIN, and INBODY, Judges.

HANNON, Judge.

Connie Janssen (Janssen) was convicted of the abuse of a vulnerable adult, in violation of Neb. Rev. Stat. § 28-386 (Reissue 1995). Janssen appeals her conviction, arguing that the court erred in allowing a social worker to testify regarding the victim's mental and functional impairment, in not properly instructing the jury, and in not sentencing her to a term of probation. Janssen also argues that the evidence was insufficient to sustain the verdict. We find no merit in errors assigned by Janssen, but on the basis of plain error, we conclude that an issue not supported by the evidence was submitted to the jury and that Janssen was prejudiced thereby. Accordingly, we reverse, and remand for a new trial.

## I. PROCEDURAL BACKGROUND

The information charged that "[o]n or about June, 1995, through December, 1996, in Dodge County, Nebraska, Connie Janssen, did then and there, knowingly and intentionally cause or permit a vulnerable adult to be exploited, or denied essential services, in violation of § 28-386 . . . ." Before trial, Janssen filed a motion for bill of particulars, a motion to quash, a plea in abatement, and a demurrer. All were overruled. Janssen does not assign any of these rulings as error.

## II. FACTUAL BACKGROUND

As we are required to do, we shall review the facts in the light most favorable to the State. See, *State v. Mantich*, 249 Neb. 311, 543 N.W.2d 181 (1996); *State v. Cisneros*, 248 Neb. 372, 535 N.W.2d 703 (1995).

At the time of trial, Janssen's mother-in-law, Helen Janssen, was 81 years old. In 1994, Helen was living in a nursing home in Scribner, Nebraska, but moved to the Saunders County Care Center in July 1995. In January 1996, Helen moved to the

Merrick Manor nursing home in Fremont, Nebraska. Helen's sole source of income was a monthly Social Security check of between $700 and $800. Helen was receiving government assistance and was therefore required to pay all but $40 of her income to the nursing home for her care. Helen was allowed to keep $40 a month for her personal needs.

In November 1996, Patricia Bergman, the caseworker handling Helen's case for the Nebraska Department of Health and Human Services, was contacted by Janice Andersen of Merrick Manor regarding Helen's account. At the time, Helen's account with the nursing home was 3 months in arrears. Bergman investigated Helen's financial situation and testified about her findings.

In 1993, Helen had designated her son, James Janssen, as her attorney in fact and granted him power to receive payments, draw checks, and make investments, and she granted him other powers to conduct her business. In October 1994, Helen designated both James and Janssen, his wife, as her attorneys in fact. The power of attorney stated that they had full and unrestricted power and authority to conduct her affairs and, specifically, to

> deposit any moneys to which I am entitled, and to withdraw the same for my use and benefit, or for the purpose of investment without any restriction whatsoever, and to pay himself/herself a reasonable amount for the performance of the duties and powers authorized in and by this durable power of attorney.

The evidence from the microfilm records of the First State Bank, Fremont, Nebraska, shows that the following checks cleared Helen's bank account; that they were all made payable to the bank; that they were all drawn and signed "Connie Janssen P.O.A."; and that the checks were for the amounts shown and contained the notes thereon as indicated:

| Date | Amount | Note On Memo Line |
| --- | --- | --- |
| 7-10-96 | $100 | Helen's Clothing |
| 8-5-96 | $200 | Personal Needs for Helen |
| 8-29-96 | $200 | Cash |
| 9-13-96 | $150 | September |
| 9-18-96 | $40 | Helen's Monthly Account |

| 10-11-96 | $250.75 | Helen's Resident Care #405 |
| 9-23-96 | $250.75 | Resident Care-Helen Janssen - #405 |

The court also received evidence of two transfers from Helen's bank account, one in June 1996 and the other in August. The transfers were for $500 and $300, respectively. A bank officer established that this money was transferred into Janssen and James' account by Janssen.

Bergman testified that Merrick Manor keeps track of the personal property maintained by its residents. The court received a copy of the inventory of Helen's possessions, which was dated January 18, 1996. The document showed that a television was added to Helen's possessions on January 19, 1996, but that no other additions were listed. No cash deposits had been made to her account at the nursing home. There was no indication of purchases of clothing in July 1996 or of personal items in August 1996, as checks issued in those months indicated.

Det. Robert Buer of the Fremont Police Department, a police officer with several years' experience, testified that he met with Janssen on December 18, 1996, and showed her the checks and account transfers listed above. Janssen admitted writing the checks and transferring the funds. Buer testified that Janssen claimed the checks were for Helen's care and personal needs. On January 20, 1997, Buer again met with Janssen and explained that he had received information regarding a business venture of Janssen and James. According to Buer, Janssen then stated that a portion of the money from Helen's account had been used for utilities and products of the business venture. Janssen stated that she planned to repay the money to Helen's account. Buer testified that Janssen admitted she knew it was wrong to use Helen's money in this fashion.

The record discloses that Janssen and James started a business which was unsuccessful and placed them in financial distress. This evidence might explain Janssen's motive for the crime, but it is not relevant to any of the issues on this appeal, and therefore it is not summarized.

Bergman testified that she had seen Helen in person on three occasions. Bergman stated that she first saw Helen in early 1994

when Helen entered the nursing home. When asked about that visit, Bergman said, "Um, actual intake worker does the first initial application for Medicaid and determine[s] eligibility for the finances and resources, human resources, and then after the case is opened then I receive the case." Bergman testified that in early 1994, Helen was living in a nursing home in Scribner. Bergman testified that she had "met" Helen and had "come into contact" with her three times. The first meeting was after the "initial report," and the last meeting was the day before trial. Bergman did not identify when the other contact was made. With this foundation, Bergman testified, without objection, that Helen was 81 years of age, incontinent, and unable to carry on a conversation. Defense counsel objected to the prosecutor's asking Bergman if Helen was oriented as to time and place. After a discussion out of the presence of the jury, the objection was overruled, and Bergman testified that Helen was not oriented to time and place and appeared incapable of taking her own medicine and living independently. However, the discussion of counsel established that the only disclosed basis for these opinions was the knowledge Bergman obtained in her interview with Helen the day before Bergman testified.

Upon cross-examination, Bergman testified that Helen was not "kicked out of the nursing home" or denied any essential services.

Andersen, the Merrick Manor employee responsible for billing and collections, testified that Helen lived in room No. 405 at Merrick Manor and that Janssen handled Helen's financial transactions. Andersen also testified that Merrick Manor did not receive any of the checks or sums of money shown by the above-listed checks; that payment for Helen's monthly bill was late in May, June, July, and August; and that no payment was received for September and October. Andersen had several conversations with Janssen about the unpaid account, and Janssen gave her various excuses and later told Andersen that she and James had bought a building and that "the building was draining them." At one point, Janssen told Andersen that she and James had been using Helen's money. Andersen testified that Merrick Manor set up a payment plan whereby Janssen would pay $200 per month, plus interest, to reduce the amount

owed to Merrick Manor. Janssen made only one payment toward the outstanding balance.

In Janssen's testimony, she admitted signing the checks but claimed generally to have used some of the funds for Helen. Janssen also testified about the failed business venture, that the money was invested in the business for Helen, and that she and James had merely "borrowed" money from Helen. When asked on cross-examination if Helen was capable of living by herself at any time during the period January to December 1996, Janssen answered, "She needed supervised care."

On rebuttal, Peggy Kupfer, a registered nurse and the nurse manager of Helen's unit at Merrick Manor, testified regarding the time from January 1996 until the time of trial. Kupfer testified that Helen was incapable of living alone since she had been in the nursing home, that she was not oriented as to time and place, and that she was unable to carry on an intelligent conversation. Kupfer testified that the belongings of the residents were periodically checked to see if any new items had been brought in and that Helen had received no clothing or items of personal property since January 16, 1996, except a television on January 19, 1996.

Janssen was convicted and sentenced to "two (2) years to four (4) years incarceration in the custody of the Nebraska Department of Corrections."

## III. ASSIGNMENTS OF ERROR

Janssen argues that the lower court erred (1) in allowing a social worker to testify regarding Helen's mental and functional impairment, (2) in not properly instructing the jury, and (3) in not sentencing Janssen to a term of probation. Janssen also alleges that the evidence was insufficient to sustain the verdict. On the basis of plain error, we conclude that the conviction must be reversed, but since the cause must be retried, we will consider the assigned errors, except that concerning the type of sentence.

## IV. STANDARD OF REVIEW

■ In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of the witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the

absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Hill*, 254 Neb. 460, 577 N.W.2d 259 (1998); *State v. Howard*, 253 Neb. 523, 571 N.W.2d 308 (1997).

■ On a claim of insufficiency of the evidence, an appellate court will not set aside a guilty verdict in a criminal case where such verdict is supported by relevant evidence. *Howard, supra*; *State v. Earl*, 252 Neb. 127, 560 N.W.2d 491 (1997).

■ The dispositive issue in this appeal presents a question of law, and when considering a question of law, an appellate court reaches a conclusion independent of the lower court's ruling. *State v. Adams*, 251 Neb. 461, 558 N.W.2d 298 (1997).

## V. ANALYSIS

### 1. SOCIAL WORKER'S TESTIMONY

Janssen argues that the court erred by allowing Bergman to testify regarding her observations of Helen. Specifically, Janssen argues that Bergman should not have been allowed to testify because (1) it was a violation of the discovery process, (2) it encourages misconduct, (3) Bergman was not an expert witness, and (4) her testimony was irrelevant. We are unable to decipher, and Janssen's brief fails to explain, how allowing Bergman to testify was a violation of the discovery process or encourages misconduct. However, we shall address questions raised by the third and fourth arguments together.

Janssen argues:

> Finally, there is no foundation for Ms. Bergman's testimony relating to Helen Janssen's functional or mental ability because Ms. Bergman is not qualified to testify as an expert witness. The terms "diagnosis" and "evaluation" found in Neb. Rev. Stat. Secs. 28-368 and 369 [(Reissue 1995)] indicate that the [L]egislature envisioned the involvement of a physician.

Brief for appellant at 10. We note that Janssen cites no authority for her position.

Neb. Rev. Stat. § 28-368 (Reissue 1995) provides: "Substantial functional impairment shall mean a substantial incapability, because of physical limitations, of living indepen-

dently or providing self-care as determined through observation, diagnosis, investigation, or evaluation." Neb. Rev. Stat. § 28-369 (Reissue 1995) provides: "Substantial mental impairment shall mean a substantial disorder of thought, mood, perception, orientation, or memory that grossly impairs judgment, behavior, or ability to live independently or provide self-care as revealed by observation, diagnosis, investigation, or evaluation." Both of these statutes provide "observation" as one of the means to be used to determine impairment. Obviously, if a layperson has had an opportunity to observe sufficient activity of the victim to testify to the required impairment, the layperson is qualified to tell what he or she knows. Furthermore, Neb. Rev. Stat. § 27-701 (Reissue 1995) provides:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

The following rules are well established: "A lay witness may testify concerning physical injuries and conditions which are susceptible to observation by an ordinary person." 32 C.J.S. *Evidence* § 550 at 363 (1996). "Subject to the general qualifications and limitations applicable affecting the testimony of a nonexpert or lay witness, such a witness usually may state the apparent physical condition or the apparent condition of health of another." *Id.*, § 552 at 366. "[A] nonexpert witness who is shown to have had a more or less intimate acquaintance with a person may be permitted to state an opinion as to the mental condition of that person by giving the facts and circumstances upon which the opinion is based." *In re Estate of Wagner*, 246 Neb. 625, 635, 522 N.W.2d 159, 167 (1994). Whether a person is impaired, be it mentally or physically, is merely a bodily or mental condition which quite frequently can be observed and testified to by a witness who has had the opportunity to observe the condition in issue. Bergman was clearly not disqualified to testify because she was not a medical expert.

However, it is fundamental that "[a] witness may not testify to a matter unless evidence is introduced sufficient to sup-

port a finding that he has personal knowledge of the matter." Neb. Rev. Stat. § 27-602 (Reissue 1995). It seems clear that to convict a person of exploiting a vulnerable adult, the exploitation must occur while the exploited person was vulnerable. Bergman never testified as to the nature and extent of her contact with Helen. Evidence on Bergman's first two meetings establishes that she did not have sufficient contacts with Helen to have observed her physical and mental impairment. The time of the second meeting must be sometime after 1994 and before the third meeting. Apparently, the visit the day before the trial was intended to establish a foundation for Bergman's testimony, but the evidence does not show that even that meeting was sufficient to provide foundation for Bergman to testify about Helen's physical and mental impairment. Furthermore, at the time Bergman testified, there was no evidence that Helen's condition was the same at the time Helen was exploited as when Bergman saw her. Bergman's testimony on Helen's condition lacked the necessary foundation and was not admissible. Such testimony was insufficient to support a finding that Helen was a vulnerable adult. However, Janssen admitted on her cross-examination that Helen needed supervised care to live, and apparently, the prosecutor must have recognized the deficiency in Bergman's testimony and called a nurse who cared for Helen as a rebuttal witness. We shall consider this evidence later in this opinion when we consider the sufficiency of the evidence issue.

### 2. JURY INSTRUCTIONS

The trial court gave jury instruction No. 6, which stated:

> The laws of the State of Nebraska provide that a power of Attorney creates a fiduciary relationship between the Attorney in Fact and the Principal. The Attorney in fact is prohibited from profiting from the relationship to the detriment of the Principal or having a personal stake that conflicts with the principal's interest in a transaction in which the agent represents the Principal.

Janssen admits that both sentences in jury instruction No. 6 are a correct recitation of the law. Janssen argues that "the first sentence was all that was needed. . . . The second sentence was misleading to the jury, was not warranted by the evidence, and

was unfairly prejudicial to defendant." Brief for appellant at 16. Janssen also argues that jury instruction No. 6 is primarily a civil jury instruction and that "[t]he problem is that it does not distinguish between prohibited civilly or prohibited criminally. This makes the Instruction further misleading and unfairly prejudicial to defendant." Brief for appellant at 17.

Neb. Rev. Stat. § 28-358 (Reissue 1995) defines exploitation as "the taking of property of a vulnerable adult by means of undue influence, breach of a fiduciary relationship, deception, or extortion or by any unlawful means." The Nebraska Supreme Court has stated that a power of attorney is an instrument in writing authorizing another to act as one's agent. *Mischke v. Mischke*, 247 Neb. 752, 530 N.W.2d 235 (1995); *Fletcher v. Mathew*, 233 Neb. 853, 448 N.W.2d 576 (1989). The evidence is not disputed that Helen signed a power of attorney, thus making Janssen her agent. An agent and principal are in a fiduciary relationship such that the agent has an obligation to refrain from doing any harmful act to the principal. *Fletcher, supra*; *Grone v. Lincoln Mut. Life Ins. Co.*, 230 Neb. 144, 430 N.W.2d 507 (1988). Also, an agent is generally required to act solely for the benefit of his or her principal in all matters connected with agency. *Fletcher, supra*. The nature and extent of fiduciary duties, what constitutes the taking of property "by any unlawful means," as well as property rights are defined by civil law not criminal law, and one of the obvious functions of criminal law is to protect the property rights defined by civil law. The instruction was not erroneous.

Janssen also claims the trial court erred in giving jury instruction No. 5. The relevant portion of jury instruction No. 5 states:

> A "substantial functional impairment" is defined as a substantial incapability, because of physical limitations, of living independently or providing self-care.
>
> A "substantial mental impairment" is defined as a substantial disorder of thought, mood, perception, orientation, or memory that grossly impairs judgment, behavior, or ability to live independently or provide self-care.

These definitions are contained in §§ 28-368 and 28-369. However, the jury instruction omitted the additional phrase, in

these statutes, "as determined/revealed by observation, diagnosis, investigation, or evaluation." Janssen argues that omitting this phrase "completely changes the jury instruction." Brief for appellant at 19. We disagree and note the omitted phrase describes the methods of proving the definitions. Whether the litigant has sufficiently established that a person is suffering from a substantial functional impairment or a substantial mental impairment by adducing an "observation, diagnosis, investigation, or evaluation" is a question of law to be decided by the judge rather than the jury. The trial court did not err in omitting this phrase from jury instruction No. 5.

### 3. Sufficiency of Evidence

Janssen argues that the evidence was insufficient to support her conviction. Section 28-386 provides in part: "(1) A person commits knowing and intentional abuse of a vulnerable adult if he or she through a knowing and intentional act causes or permits a vulnerable adult to be: (a) Physically injured; (b) Unreasonably confined; (c) Sexually abused; (d) Exploited; (e) Cruelly punished; or (f) Denied essential services."

### (a) Vulnerable Adult

The initial step when determining if § 28-386 has been violated is to determine whether the victim was a vulnerable adult. *State v. Stubbs*, 252 Neb. 420, 562 N.W.2d 547 (1997). The State has the burden of proving all essential elements of the crime charged. *State v. Fahlk*, 246 Neb. 834, 524 N.W.2d 39 (1994); *State v. Wright*, 235 Neb. 564, 456 N.W.2d 288 (1990). A vulnerable adult is defined as any person 18 years of age or older who has a substantial mental or functional impairment or for whom a guardian has been appointed under the Nebraska Probate Code. Neb. Rev. Stat. § 28-371 (Reissue 1995). In the instant case, determining whether Janssen was a vulnerable adult is limited to a finding of whether she had substantial mental or functional impairment, as no evidence of the appointment of a guardian was presented.

We have previously indicated that Bergman's testimony did not have sufficient foundation to support a finding that Helen was mentally or physically impaired. However, Janssen admitted that Helen needed supervised care. Kupfer testified that

Helen was a patient in her care from January 18, 1996, until the time of trial, and that she saw Helen on a regular basis. Kupfer testified that Helen was incapable of living alone, that she was not mentally oriented as to time and place, and that she could not carry on a conversation. Kupfer's testimony was by itself sufficient to support a finding that Helen was a vulnerable adult. She was a rebuttal witness, and defense counsel objected to questions directed to her when the prosecutor began to elicit this information. However, the objections were overruled, and no error has been assigned concerning that ruling. There is other admissible evidence that would help support the same conclusion, but in view of Janssen's admission and Kupfer's testimony, we need not restate that evidence.

The information charges that Helen was exploited "[o]n or about June, 1995, through December, 1996." There is no evidence of Helen's vulnerability or that she was exploited during 1995. However, the exact time when a criminal offense is committed is not an essential element of a crime unless the statute defining the offense makes a date or time an indispensable element of the crime charged. *State v. Wehrle*, 223 Neb. 928, 395 N.W.2d 142 (1986).

The evidence clearly shows that Janssen took Helen's money on nine separate occasions from June 5, 1996, through October 11, 1996, and that during this time, Helen was a vulnerable adult. The jury did not accept Janssen's explanation for taking the money, and we would not expect a jury to accept such an explanation. The evidence is clearly sufficient to support a verdict that Janssen violated § 28-386(1)(d).

### (b) Denial of Essential Services

The information alleged Janssen had caused or permitted a vulnerable adult "to be exploited, or denied essential services." "Denial of essential services shall mean that essential services are denied or neglected to such an extent that there is actual physical injury to a vulnerable adult or imminent danger of the vulnerable adult suffering physical injury or death." Neb. Rev. Stat. § 28-355 (Reissue 1995). "Essential services shall mean those services necessary to safeguard the person or property of a vulnerable adult. Such services shall include, but not

be limited to, sufficient and appropriate food and clothing, temperate and sanitary shelter, treatment for physical needs, and proper supervision." Neb. Rev. Stat. § 28-357 (Reissue 1995). The jury was instructed on these statutory definitions. There is no evidence that Helen suffered actual physical injury or that she was in imminent danger of suffering physical injury or death. When viewed in the light most favorable to the State, the evidence shows Helen was a patient in a nursing home, but there is no evidence she suffered any physical injury, and there was no evidence that Merrick Manor was going to physically injure Helen because her debt to the home was not being paid. Bergman even testified Helen was not denied essential services. The evidence clearly would not support a finding that Janssen caused or permitted Helen to be denied essential services.

> [A] trial court has the duty to instruct the jury on issues presented by the pleadings and the evidence. . . . Because of this duty, the trial court, on its own motion, must correctly instruct on the law, and an appellate court may take cognizance of plain error if such instructions indicate a probable miscarriage of justice. . . . [T]he proper method of presenting a case to a jury in its instructions is by a clear and concise statement by the trial court of the issues which find support in the evidence.

*State v. Adams*, 251 Neb. 461, 464-65, 558 N.W.2d 298, 300-01 (1997).

The *Adams* court found three plain errors after determining the trial court had (1) not instructed on causation, (2) not limited the jury's consideration of the blood test, and (3) instructed that the defendant could be convicted of being under the influence of alcoholic liquor or drugs when there was no evidence regarding drugs. The similarity of the last error in *Adams* to the instruction on the denial of essential services in this case is striking.

When, during oral argument on this case, a judge presented this possible plain error to the attorney representing the State, the attorney admitted that in view of *Adams,* the instruction including denial of essential services concerned him, but he argued that in the case at hand, the instruction was not prejudicial. The State's attorney maintained that the *Adams* court found

the instruction prejudiced the defendant because it implied the defendant was a drug user. We agree with this reading of *Adams.* However, if the instruction in the *Adams* case implied the defendant was a drug user, the instruction in this case implied Janssen deprived Helen of food, clothing, et cetera, to the point of actual or imminent physical injury or death. We are inclined to believe a sizeable portion of our society would rather have a court imply they used drugs than that they deprived an elderly person of the essentials of life. On the basis of *Adams,* we conclude that this plain error requires the reversal of Janssen's conviction. We observe that in any case, the court's instruction allowed Janssen to be convicted on a basis for which there was no evidence in the record.

## VI. CONCLUSION

We have concluded that there was sufficient evidence to sustain a conviction of Janssen for the abuse of a vulnerable adult by exploitation, and therefore, she may be retried, notwithstanding the fact that plain error requires a reversal of the conviction. We therefore vacate Janssen's conviction and sentence, and remand the cause to the district court for a new trial consistent with this opinion.

REVERSED AND REMANDED FOR A NEW TRIAL.