BILL R. BOWERS AND ILENE SUE BOWERS, APPELLANTS, V.
DUANE C. DOUGHERTY, DEFENDANT AND
THIRD-PARTY PLAINTIFF, APPELLEE, TIMOTHY K. KELSO
AND HARRIS, FELDMAN, STUMPF LAW OFFICES,
THIRD-PARTY DEFENDANTS, APPELLEES.

615 N.W.2d 449

Filed July 28, 2000.    No. S-99-261.

David L. Herzog, of Herzog & Herzog, P.C., and Kathy Pate Knickrehm for appellants.

Milton A. Katskee, of Katskee, Henatsch & Suing, for appellee Duane C. Dougherty.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, McCORMACK, and MILLER-LERMAN, JJ.

HENDRY, C.J.

## INTRODUCTION

Bill R. Bowers and Ilene Sue Bowers brought a claim for legal malpractice against attorney Duane C. Dougherty. The court entered judgment in favor of Dougherty, finding that any negligence on Dougherty's part did not proximately cause damage to the Bowerses. The Bowerses appealed, and we moved the case to our docket pursuant to our authority to regulate the caseloads of this court and the Nebraska Court of Appeals. Neb. Rev. Stat. § 24-1106(3) (Reissue 1995).

## FACTUAL BACKGROUND OF
### *NORWEST BANK NEB. v. BOWERS*

The nexus of this case involves litigation over transfers of property and assets from Henry and Eleanor Greenberg to their daughter, Ilene. For many years prior to the transfers, the Greenbergs operated Philips Stores, Inc., a chain of retail stores in and around Omaha, Nebraska. On June 30, 1976, Norwest Bank Nebraska, N.A. (Norwest), loaned Philips Realty Co. $975,000 to assist with financing the construction of a new Philips store in Council Bluffs, Iowa. Under the terms of the loan, full repayment would be completed no later than June 1, 1991. The loan was secured by certain real estate owned by Philips Realty.

As a part of this agreement, the Greenbergs both signed a mortgage loan guaranty agreement, which obligated each of them individually and personally on the $975,000 note. Henry, as president of Philips Stores, also signed a mortgage loan guaranty agreement obligating Philips Stores on the $975,000 note. Philips Realty's holdings were later transferred into "MMP Trust." Henry held a two-thirds interest in MMP Trust, and Philips Stores held the other one-third interest.

The profits of Philips Stores began to decline. The last year the business showed any profit was 1980, when a substantial debt owed by Philips Stores was written off. In 1984, Philips Stores posted a $348,000 loss. Also in 1984, Norwest required a personal loan guaranty, signed by Henry alone, for a separate debt owed by Philips Stores. Philips Stores' debt to Norwest was in the form of a $750,000 revolving demand note secured by accounts receivable. In 1985, Philips Stores posted a $352,000 loss.

In the spring of 1985, Henry met with Michael McQuillan, the loan officer at Norwest responsible for Philips Stores' revolving demand note from 1984 to 1986. At that meeting, according to McQuillan's notes, Henry was told that if Philips Stores posted another year of losses, it would be necessary to liquidate all of the company's assets to pay off the demand note because the loan had become too leveraged; that is, the bank did not believe that Philips Stores would have sufficient accounts receivable to secure the demand note if the company's losses continued.

Philips Stores continued to lose money, and in September 1986, Henry again met with McQuillan and discussed the liqui-

dation of the business. According to McQuillan, at that meeting, Henry presented a plan to liquidate the business, with the Philips store in Council Bluffs closing in January 1987, and the remainder of Philips Stores' retail operations closing by July 1987. Henry asserted later that he was only considering closing one of the Philips stores in September 1986.

On January 5, 1987, the Greenbergs transferred three of their real estate assets to their daughter, Ilene. The attorney who handled these transfers was Eleanor's younger brother, Sheldon Harris, who had served as the Greenbergs' attorney for over 30 years. Henry met with Harris previously in November 1986, after the meeting with Norwest, to prepare these transfers to Ilene as part of the Greenbergs' "estate planning." At that time, Eleanor was suffering from terminal cancer and, according to Henry, was concerned for Ilene's needs and wanted Ilene to have something in her name.

On January 5, 1987, Henry conveyed to Ilene all of his interest in the "108th and Q Street Farm Partnership," an undeveloped area of commercial real estate. On the same day, the Greenbergs together conveyed to Ilene all of their interest in the Yorkshire Manor apartments, an apartment complex in Fremont, Nebraska, and their respective one-half interests in their residence, a condominium located in Omaha, Nebraska, with a life estate reserved in the condominium for the Greenbergs. Ilene gave no consideration for any of the transfers.

The Council Bluffs Philips store closed in January 1987, and by July 1987, all Philips Stores' retail operations ceased. As of July, Philips Realty was in default on the $975,000 promissory note, and Philips Stores had an unpaid balance of approximately $75,000 on the revolving demand note.

In July 1987, Henry gave Philips Stores' computer to Ilene. She took it home to continue collecting outstanding credit card debts in an effort to help pay off the remaining balance on the revolving demand note. On July 29, Eleanor transferred $68,869 in cash to Ilene, and on August 15, Henry transferred his 1986 Chevrolet Corsica to Ilene. Eleanor died on August 3.

The three real estate transfers, cash, car, and computer were all listed on the Greenbergs' 1987 tax return as gifts to Ilene. The value listed for each of these items was as follows:

(1) 25-percent interest in 108th and Q Street Farm Partnership from Henry: $150,000;

(2) 47-percent interest in the Yorkshire Manor apartments from the Greenbergs: $94,000;

(3) 50-percent interest from Henry and 50-percent interest from Eleanor in condominium: $150,000;

(4) Computer from Henry: $6,000;

(5) 1986 Chevrolet Corsica from Henry: $9,500;

(6) Cash from Eleanor: $68,869.

Total value of gifts stated on return: $584,369

Philips Stores' revolving demand note with Norwest was eventually paid in full by liquidation of the Philips Stores' inventory and by the collection of receivables. However, the remaining balance on the defaulted $975,000 promissory note was not paid. In December 1987, Norwest brought suit in Iowa against Philips Realty, Philips Stores, Henry, the trustees of the MMP Trust, and First National Bank of Council Bluffs (First National Bank), seeking to foreclose on the Council Bluffs property securing the promissory note and seeking a judgment in the amount of $844,459.96. This represented $796,030.32 still owed on the promissory note; $48,154.64 in unpaid interest beginning on July 1, 1987; and title search fees of $275.

Norwest received a judgment in the district court for Pottawattamie County, Iowa, for the full amount against Henry, Philips Stores, and Philips Realty. The real estate securing the promissory note was then sold, leaving approximately $561,197 outstanding from the judgment. Norwest registered this judgment in Nebraska on December 9, 1988.

In order to collect the remaining $561,197 from the unsatisfied judgment, Norwest brought suit in 1989 in the district court for Douglas County, Nebraska, against the Bowerses to have the 1987 transfers to Ilene set aside as fraudulent. Norwest instituted one suit against only Ilene and a second suit against both the Bowerses. The two cases were ultimately consolidated.

Harris, recognizing that he would be called as a witness in the case, sought other counsel to represent the Bowerses. Harris recommended Jerome Ortman, who became counsel of record to defend the Bowerses against Norwest's suit. Dougherty also

represented the Bowerses in this matter and was "second chair" to Ortman during the trial.

Prior to trial, the Bowerses submitted a motion in limine, seeking to preclude evidence regarding the valuation of several of Henry's assets, which Norwest intended to introduce at trial. The Bowerses essentially argued that because these valuations were done after January 5, 1987, they were irrelevant to the issue of Henry's solvency on that date. The court overruled the Bowerses' motion.

The evidence at trial focused primarily on the issue of whether the Greenbergs were insolvent on January 5, 1987, or whether the January transfers to Ilene rendered the Greenbergs insolvent for purposes of Neb. Rev. Stat. § 36-604 (Reissue 1988) (repealed, see 1989 Neb. Laws, L.B. 423). Both Harris and Henry testified that based on their valuations of the Greenbergs' assets done in November 1986, the Greenbergs were not insolvent in January 1987, nor did the transfers to Ilene render them insolvent. Further, Henry and Harris testified that the purpose of the January transfers was estate planning, motivated by Eleanor's poor health and her concerns for Ilene's future, and was not an attempt to delay, hinder, or defraud Norwest.

Henry's and Harris' valuations of the Greenbergs' assets in the fall of 1986 were refuted by Norwest's experts. For example, Harris and Henry valued the stock of Philips Stores at $734,000 in November 1986, but on the Greenbergs' 1986 tax returns, the stock was valued at zero. Janet Labenz, a certified public accountant and one of the expert witnesses for Norwest, testified that Philips Stores' stock was worthless as of January 5, 1987.

Labenz also testified regarding the estate planning aspects of the transfers to Ilene. Labenz testified that the transfers resulted in $659,000 worth of taxable gain to Ilene. However, if the property had simply been transferred by Henry completely to Eleanor and then devised to Ilene upon Eleanor's death, under the tax laws in effect at the time, the taxable gain would have been only $45,000. Labenz also noted that the transfers would have resulted in significant tax liabilities for the Greenbergs in 1986, but for the fact that they were able to write off the stock in Philips Stores as worthless.

There was also evidence at trial that the condominium originally conveyed to Ilene was thereafter conveyed by both Ilene and Bill to a third-party purchaser in August 1988 for $255,000. At the time of the conveyance, the condominium was subject to a $60,000 mortgage. Ilene testified that the proceeds from the condominium's sale paid off the mortgage, paid off repairs and real estate agent fees, and purportedly also went to satisfy a lien guaranteed by Henry to First National Bank, with the remainder going to Ilene.

However, Jerry Jares, vice president of First National Bank, testified that the bank did not receive any proceeds from the condominium sale. Jares explained that First National Bank had previously loaned Philips Stores $185,000. This $185,000 note was secured by a mortgage against certain real estate holdings of Philips Stores and guaranteed by Henry. The $185,000 note was not secured by the condominium. First National Bank later sold and assigned this note to an undisclosed buyer in 1988.

There was no evidence at trial that any of the remaining real estate assets transferred to Ilene had been reconveyed to a third party. However, the Chevrolet Corsica had been destroyed in a car accident sometime prior to trial.

The district court for Douglas County ruled for Norwest on all counts, finding that Henry was insolvent at the time of the transfers and that the transfers were made to hinder, delay, or defraud creditors.

In the court's July 27, 1992, judgment, Norwest was granted the following: (1) a judgment against Ilene and Bill for $124,000, representing the proceeds from the condominium sale; (2) a judgment against Ilene for $68,869 plus interest, representing the cash transfer from Eleanor to Ilene shortly before Eleanor's death; (3) a judgment against Ilene for $9,000, representing the value of the 1986 Chevrolet Corsica; and (4) an order to Ilene to reconvey to Norwest her interest in the 108th and Q Street Farm Partnership, the Yorkshire Manor apartments, and Philips Stores' computer.

On July 28, 1992, Norwest initiated garnishment proceedings against 19 entities connected with the Bowerses in an effort to collect the judgments entered in favor of Norwest. On July 30, the Bowerses filed a motion for judgment notwithstanding the

verdict, a motion for new trial, and a motion for an order of remittitur and notice of hearing. Norwest also filed a motion to appoint a receiver and a motion to amend the court's July 27 order. A hearing was held on the motions on August 4 and continued on August 17. Ortman appeared at the hearing for the Bowerses on August 4, and Dougherty appeared for the Bowerses on August 17 and argued the motion for new trial.

On August 17, 1992, the court granted Norwest's request to appoint a receiver and modified its July 27 order. This modification ordered Ilene to also account for any money, property, or other proceeds accruing to her from either the 108th and Q Street Farm Partnership or the Yorkshire Manor apartments after the Greenbergs had transferred their interests to Ilene. The Bowerses' motions were overruled. The Bowerses appealed from the overruling of the motion for new trial.

On appeal to this court, we noted that during the hearing on the motion for new trial on August 17, 1992, Dougherty twice requested that the court overrule the Bowerses' motion for new trial. *Norwest Bank Neb. v. Bowers*, 246 Neb. 83, 516 N.W.2d 623 (1994). Because a party cannot complain of an error it has invited the court to commit, the appeal was dismissed without reaching the merits.

## FACTUAL BACKGROUND OF
### *BOWERS v. DOUGHERTY*

On August 15, 1994, the Bowerses brought a legal malpractice suit against Dougherty regarding his handling of the Norwest litigation, specifically his argument at the hearing regarding the motion for new trial on August 17, 1992. Dougherty filed a third-party petition against attorney Timothy K. Kelso and Harris, Feldman, Stumpf Law Offices (Harris, Feldman) as third-party defendants.

The Bowerses moved for partial summary judgment on the issues of liability and proximate cause. Dougherty moved for full summary judgment in his favor. Included in Dougherty's exhibits in support of his motion for summary judgment was the affidavit of attorney Wallace Richardson, an expert witness on behalf of Dougherty. The court granted summary judgment on the issue of negligence in favor of the Bowerses, but determined

that genuine issues of material fact existed as to whether Dougherty's negligence proximately caused any damage to the Bowerses. The court overruled Dougherty's motion for summary judgment. The finding that Dougherty was negligent has not been challenged on appeal.

On June 17, 1998, Dougherty renewed his motion for summary judgment on the issue of proximate cause, based on *Baker v. Fabian, Thielen & Thielen*, 254 Neb. 697, 578 N.W.2d 446 (1998). In this motion, the expert testimony of Richardson was specifically withdrawn and not included as an exhibit. This motion for summary judgment was also overruled. By agreement of the parties, the matter was then submitted to the court without a jury upon all the exhibits submitted in all previous hearings and motions. The evidence disclosed the following:

Ortman testified in his deposition that Harris, Feldman, of which Harris was a partner, had offices located across the hall from Ortman in 1989 when Norwest instituted suit against the Bowerses. Harris came to Ortman and asked him to assist with the Norwest litigation. Ortman testified that "[Harris] felt he might be a witness in the thing, and he wanted me to help him with it."

Ortman also testified that while he became involved on behalf of the Bowerses, "Harris, Feldman firm did everything. It was a situation where if something came to us, it went across the hall to Harris, Feldman." Ortman also testified that "[n]othing was done without [Harris, Feldman's] permission, approval." Ortman billed only the Bowerses for his services, and the Bowerses paid Ortman and Dougherty. Ortman further testified that the appellate brief in the Norwest litigation filed on behalf of the Bowerses was prepared by Harris' son and Kelso, who were both employed by Harris, Feldman. This appellate brief was submitted to this court by Ortman. Ortman further testified that although Dougherty was second chair during trial and argued the Bowerses' motion for new trial, Dougherty had no subsequent involvement in the preparation or filing of the appellate brief, nor was he involved in oral argument.

Dougherty testified in his deposition that he had no involvement with the Bowerses' appeal because his employment relationship with Ortman ended before work began on the appeal. Dougherty also stated that prior to the August 17, 1992, hearing

on the motion for new trial, Dougherty discussed the motion at length with Kelso. Kelso instructed Dougherty that if the court was not willing to rule on the motion for new trial immediately, Dougherty should ask for leave to withdraw the motion so that either way, the Bowerses could immediately file their appeal. Kelso did not instruct Dougherty to request that the court overrule the motion for new trial.

On August 17, 1992, while arguing the motion for new trial, Dougherty stated, "I'd ask the Court to just simply overrule our motion for new trial at this time, your Honor." At the close of his argument, Dougherty stated again, "[W]e would like to file a Notice of Appeal today if the Court would like to overrule our motion for new trial." This invitation by Dougherty for the court to overrule the Bowerses' motion for new trial is what led to the dismissal of the Bowerses' appeal in *Norwest Bank Neb. v. Bowers*, 246 Neb. 83, 516 N.W.2d 623 (1994).

On January 27, 1999, the district court in this case ruled in Dougherty's favor, finding that Dougherty's negligence did not proximately cause any damage suffered by the Bowerses. The court considered each assignment of error presented by the Bowerses' brief in the Norwest litigation and concluded that the Bowerses would not have prevailed on any of the issues. Therefore, even if Dougherty had properly argued the motion for new trial, the Bowerses would not have prevailed on appeal. The Bowerses appeal from this judgment in favor of Dougherty.

## ASSIGNMENTS OF ERROR

The Bowerses assert, rephrased, that the trial court erred in (1) granting summary judgment to Dougherty instead of to the Bowerses, (2) concluding that Dougherty's negligence did not proximately cause any damage to the Bowerses, and (3) admitting and considering expert testimony on the issue of whether Dougherty's negligence was a proximate cause of any damage to the Bowerses.

## STANDARD OF REVIEW

■ On a question of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below. *Streeks v. Diamond Hill Farms*, 258 Neb. 581, 605 N.W.2d 110 (2000).

■ A claim to set aside fraudulent conveyances is an action in equity. In an appeal of an equity action, an appellate court tries factual questions de novo on the record, reaching a conclusion independent of the findings of the trial court. However, where credible evidence is in conflict on a material issue of fact, the appellate court will consider and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Hanigan v. Trumble*, 252 Neb. 376, 562 N.W.2d 526 (1997).

■ The erroneous admission of evidence in a bench trial is not reversible error if other relevant evidence, properly admitted, sustains the trial court's necessary factual findings; in such case, reversal is warranted only if the record shows that the trial court actually made a factual determination, or otherwise resolved a factual issue or question, through the use of erroneously admitted evidence. *Main Street Movies v. Wellman*, 251 Neb. 367, 557 N.W.2d 641 (1997).

## ANALYSIS

### SUMMARY JUDGMENT

The Bowerses' first assignment of error is that the trial court improperly granted summary judgment in favor of Dougherty. However, a review of the record shows that Dougherty twice moved for summary judgment, and both times, the court refused to grant summary judgment in Dougherty's favor. There is nothing in the record to indicate that any kind of summary judgment order was ever granted in favor of Dougherty. Thus, this assignment of error is without merit.

### PROXIMATE CAUSE

■ In their second assignment of error, the Bowerses claim that the trial court erred in finding that Dougherty's negligence did not proximately cause any damage to the Bowerses. Instead, the Bowerses assert that but for Dougherty's negligence, they would have prevailed on appeal and the verdict in favor of Norwest rendered by the trial court would have been reversed. In a legal malpractice case, the plaintiff bears the burden to show (1) the attorney's employment, (2) the attorney's neglect of a reasonable duty, and (3) that such negligence resulted in and

was a proximate cause of damage to the client. See *Boyle v. Welsh*, 256 Neb. 118, 589 N.W.2d 118 (1999). See, also, *Rodriguez v. Nielsen*, 259 Neb. 264, 609 N.W.2d 368 (2000). At the time of the bench trial in this case, after the grant of partial summary judgment to the Bowerses, the principal unresolved issue was whether Dougherty's negligence proximately caused any damage to the Bowerses.

When a plaintiff asserts attorney malpractice at the trial level in a civil case, the plaintiff must show that he or she would have been successful in the underlying action but for the attorney's negligence. *Eno v. Watkins*, 229 Neb. 855, 429 N.W.2d 371 (1988) (plaintiff must prove she would have successfully obtained and collected judgment against other party but for attorney's negligence). See, also, *Neill v. Hemphill*, 258 Neb. 949, 607 N.W.2d 500 (2000). Accordingly, in order to show proximate cause on these facts, the Bowerses need to prove that they would have been successful on appeal. Thus, we are presented with the "case within a case" aspect of a legal malpractice claim. Accordingly, we turn to the issue of whether the Bowerses would have been successful on appeal in the underlying Norwest litigation in order to determine whether the Bowerses have shown that Dougherty's negligence proximately caused damage to the Bowerses.

### ASSIGNMENTS OF ERROR IN NORWEST APPEAL

The Bowerses assigned as error in the Norwest litigation that the trial court erred in (1) determining that Henry was insolvent at the time that the transfers were made; (2) allowing evidence and testimony as to valuation which was not in existence at the time of the transfers, as the valuation was not relevant to the status of the transferor's solvency immediately prior and subsequent to the transfers; (3) overruling the Bowerses' motion in limine; (4) setting aside any transfers made by Eleanor; (5) awarding judgment against Bill as there was no evidence that he was a transferee of any property; (6) rendering a personal judgment against the Bowerses; (7) overruling the Bowerses' motion for remittitur; and (8) overruling the Bowerses' motion to quash garnishments.

### ANALYSIS IN NORWEST APPEAL

As a preliminary matter, we note that the disputed transfers took place between January and August 1987. At that time,

the Uniform Fraudulent Conveyance Act (UFCA) was in effect, Neb. Rev. Stat. §§ 36-601 through 36-613 (Reissue 1988) (repealed, 1989 Neb. Laws, L.B. 423, see Neb. Rev. Stat. § 36-701 et seq. (Reissue 1995)). Although the Bowerses argue that the UFCA does not apply, as we previously found in *Norwest Bank Neb. v. Bowers*, 246 Neb. 83, 83-84, 516 N.W.2d 623, 624 (1994), "Norwest Bank's cause of action against the Bowerses accrued in 1987. Statutes covering substantive matters in effect at the time of the transaction govern, not later enacted statutes." Therefore, the UFCA controls our analysis of the Bowerses' claims.

The first three assignments of error in the Norwest brief relate to the solvency of Henry at the time of the transfers, the related disputed valuations placed on Henry's assets by the Bowerses and Norwest, and the motion in limine regarding the valuations. However, in the trial court's order of July 27, 1992, it specifically set aside the transfers to Ilene based on two grounds: (1) that Henry was insolvent and (2) that the transfers were made to delay, hinder, or defraud creditors. Both of these grounds are set out as separate bases under the UFCA upon which the court could declare the transfers fraudulent. §§ 36-604 and 36-607. Either finding would support the court's determination that the conveyances should be set aside under the UFCA.

While the Bowerses assigned as error the trial court's determination that Henry was insolvent, the Bowerses did not assign as error the trial court's determination that the transfers to Ilene were made with the intent to hinder, delay, or defraud creditors. Accordingly, even if the Bowerses could somehow show that Henry was solvent at the time of the transfers, this would not result in a successful appeal for the Bowerses. The court's judgment that the transfers were made to hinder, delay, or defraud creditors remains unchallenged on appeal and is binding on the Bowerses.

Because the finding that the transfers were made to hinder creditors was not assigned on appeal, we do not address it except to note that we find no plain error, on either of the aforementioned bases, in the trial court's determination that the transfers were fraudulent. See *Krumweide v. Krumweide*, 258 Neb. 785, 606 N.W.2d 778 (2000).

The Bowerses also assigned as error in the Norwest brief that the court erred in setting aside any transfers made by Eleanor because the court did not make a finding as to Eleanor's solvency at the time of the transfers. Additionally, the Bowerses assert that Norwest was not a creditor of Eleanor. This assignment of error is also without merit. The court's finding that the transfers were made to hinder and delay creditors was made as to both the Greenbergs. This separate unchallenged finding as to the Greenbergs' intent adequately supports the judgment by the court below. Further, both the Greenbergs were personally and individually liable on the defaulted Norwest note.

The Bowerses further assigned as error in the Norwest brief that the court erred in awarding judgment against Bill regarding the condominium as there was "no evidence that he was a transferee of that property." We note that Bill was not adjudged liable on any of the other transfers set aside by the court, but on only the condominium. Under the UFCA then in effect, creditors such as Norwest had the right to proceed against "any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser." § 36-609. Bill fits neither protected group, and there was no specific requirement in the UFCA that Bill be a direct titleholder of the property fraudulently conveyed. However, the UFCA further provided that the rules of law and equity will govern any case not provided for in the UFCA. See § 36-611. Thus, while the UFCA did not prevent Norwest from proceeding against Bill, we also must consider the rules of equity to determine whether adjudging Bill liable for the proceeds of the condominium sale is appropriate on these facts.

The record shows that the condominium was transferred from the Greenbergs to Ilene on January 5, 1987. Ilene was married to Bill at that time. In August 1988, the condominium was conveyed by both Ilene and Bill to a third-party purchaser. Bill's signature appears on the deed along with Ilene's. Ilene testified at trial that the $255,000 received for the condominium was used to pay off the $60,000 mortgage, roof repairs, and real estate agent fees. Ilene further testified that the proceeds from the condominium sale were additionally used to satisfy a lien

guaranteed by Henry to First National Bank, with the remainder going to Ilene.

However, Jares, vice president of First National Bank, testified that First National Bank did not receive any proceeds from the condominium sale and that the bank never had a security interest in the condominium. Jares explained that First National Bank had previously loaned Philips Stores $185,000. This $185,000 note was secured by a mortgage and guaranteed by Henry. In 1988, First National Bank sold and assigned this note to an undisclosed buyer after being approached by Harris, who represented the undisclosed buyer.

At trial, it was established that the undisclosed buyer was the Import/Export Trading Co. (Import/Export). Import/Export was a corporation formed by Harris in 1987, with Bill as treasurer-director and Harris as secretary. The assigned note from First National Bank put Import/Export in a very favorable position as a creditor of Philips Stores. During later bankruptcy proceedings against Philips Stores, Import/Export's assigned note was repaid. Bill was the director-treasurer of Import/Export during all of this time and until 1991, when Import/Export was dissolved for failure to pay corporate taxes. In summary, the proceeds from the condominium sale were used by Import/Export, with Bill acting as treasurer-director, to purchase the First National Bank note. Later, as a part of bankruptcy proceedings, Import/Export was repaid in full.

When one retains the proceeds of a fraudulent transfer, or is a beneficiary thereof, such person may be liable to the defrauded creditor, depending on the facts and circumstances of the case. See, *First Nat. Bank v. First Cadco Corp.*, 189 Neb. 553, 203 N.W.2d 770 (1973); *Bank of Brule v. Harper*, 141 Neb. 616, 4 N.W.2d 609 (1942). Under our de novo review of the record, we determine that Bill was a beneficiary of the fraudulent transfer and, as such, was liable to Norwest for the proceeds of the condominium sale.

The Bowerses also assigned as error in the Norwest brief that the trial court erred in rendering a personal judgment against them. The Bowerses assert that Norwest was only entitled under the UFCA to have the conveyances to Ilene set aside, or to disregard the conveyances and attach or levy execution upon the

property conveyed. See § 36-609. Thus, the Bowerses claim that the trial court was without authority to order a personal judgment against either Bill or Ilene. The Bowerses do not assign as error or argue in their brief that the trial court erred regarding the dollar amount of the personal judgments entered, but only that the court was without authority to impose such judgments. Section 36-609 was admittedly silent regarding a situation where fraudulently acquired property had been transferred to a person for fair consideration without knowledge of the fraud and thus could not be reconveyed to the creditor or attached. However, as we have already noted, § 36-611 stated, "In any case not provided for in sections 36-601 to 36-613 the rules of law and equity . . . shall govern."

The question is whether under the rules of equity a defrauded creditor may collect a personal judgment against the beneficiary of a fraudulent transfer. In *Bank of Brule v. Harper, supra,* we held that a personal judgment was appropriately entered against the wife of the debtor husband when the husband fraudulently transferred his property to his wife and she either retained such proceeds or received the benefit thereof. While Ilene is not Henry's wife, she is his daughter and the transferee and beneficiary of the fraudulent transfers. Bill is Henry's son-in-law, and as previously discussed, he is also a beneficiary of the fraudulent transfer of the condominium. As such, in accordance with *Bank of Brule,* it was proper to enter a personal judgment against the Bowerses. See, also, *First Nat. Bank of Omaha v. First Cadco Corp.,* 191 Neb. 678, 217 N.W.2d 93 (1974) (personal judgment against beneficiary of fraudulent transfers).

The Bowerses further assigned as error in the Norwest brief that the trial court erred in overruling their motion for remittitur, made after Norwest had begun garnishment proceedings against the Bowerses. However, the Norwest brief devotes no argument to this issue. Errors that are assigned but not argued will not be addressed by an appellate court. *Hauser v. Hauser,* 259 Neb. 653, 611 N.W.2d 840 (2000). Accordingly, we do not address this assignment of error.

The Bowerses additionally assigned as error in the Norwest brief that the trial court erred in overruling their motion to quash the garnishments initiated by Norwest. The Bowerses argue that

the judgment entered by the trial court does not become final, for purposes of garnishment proceedings, until the 30-day window to prosecute an appeal has run.

In *Production Credit Assn. of the Midlands v. Schmer*, 233 Neb. 785, 787, 448 N.W.2d 141, 143 (1989), we held that "a judgment or final order retains its vitality and is capable of being executed during the pendency of the appeal." More recently in *J.K. v. Kolbeck*, 257 Neb. 107, 110, 595 N.W.2d 875, 877 (1999) (quoting Neb. Rev. Stat. § 25-1056 (Cum. Supp. 1998)), we stated that "garnishment in aid of execution is only available 'when a judgment has been entered.' " Thus, Norwest was entitled to begin garnishment proceedings immediately after a valid judgment had been entered. We find this assignment of error to be without merit.

EXPERT TESTIMONY

Finally, the Bowerses assert in their third and last assignment of error regarding the malpractice claim against Dougherty that the trial court erred in admitting and considering the expert testimony of Richardson on the issue of proximate cause. The record is unclear whether the expert testimony of Richardson was admitted as part of the evidence at the bench trial. However, even assuming that this evidence was admitted and that its admission was erroneous, we find no reversible error. The erroneous admission of evidence in a bench trial is not reversible error if other relevant evidence, properly admitted, sustains the trial court's necessary factual findings; in such case, reversal is warranted only if the record shows that the trial court actually made a factual determination, or otherwise resolved a factual issue or question, through the use of erroneously admitted evidence. *Main Street Movies v. Wellman*, 251 Neb. 367, 557 N.W.2d 641 (1997).

As previously discussed, we have concluded under our de novo review that the relevant, admissible evidence shows Dougherty's negligence did not proximately cause any damage to the Bowerses. Further, the record does not show that the trial court actually made any of its factual determinations through the use of Richardson's expert testimony. This assignment of error is also without merit.

## CONCLUSION

Having analyzed all of the Bowerses' assignments of error in the present malpractice action, we find them to be without merit. Because the Bowerses have failed to show that their underlying appeal would have been successful, any negligence on the part of Dougherty did not proximately cause harm to the Bowerses. The decision of the trial court is affirmed.

AFFIRMED.

STEPHAN, J., not participating.