STATE OF NEBRASKA EX REL. NEBRASKA STATE BAR ASSOCIATION, RELATOR, V. JEFFREY S. FLORES, RESPONDENT.

622 N.W. 2d 632

Filed February 16, 2001.   No. S-00-114.

Denise E. Frost and Clarence E. Mock, of Johnson & Mock, for respondent.

John W. Steele for relator.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

PER CURIAM.

This is an attorney disciplinary case in which the Nebraska State Bar Association (NSBA), relator, seeks to discipline Jeffrey S. Flores, respondent.

## I. BACKGROUND

The Committee on Inquiry of the Third Disciplinary District filed formal charges against Flores pursuant to Neb. Ct. R. of Discipline 10 (rev. 2001). In count I, Flores was charged with violation of Canon 1, DR 1-102(A)(1), (3), (4), and (6) of the Code of Professional Responsibility in connection with an alleged failure to apply pension benefits belonging to Edith Erling to her nursing home care bills during an 11-month period. In count II, Flores was charged with violating DR 1-102(A)(1), (3), (4), and (6) with respect to an alleged failure to relinquish certain personal property of Erling to the personal representative of her estate. In count III, Flores was charged with violating DR 1-102(A)(1) and (6) for failing to ensure that Erling's personal funds remained sufficient to fund the type of funeral she desired. The provisions at issue provide:

DR 1-102 Misconduct.

(A) A lawyer shall not:

(1) Violate a Disciplinary Rule.

. . . .

(3) Engage in illegal conduct involving moral turpitude.

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

. . . .

(6) Engage in any other conduct that adversely reflects on his or her fitness to practice law.

In his answer to the formal charges, Flores denied the factual allegations and specifically denied that he breached any provision of the code.

At Flores' request, the matter was submitted to a referee pursuant to Neb. Ct. R. of Discipline 10(J). The referee conducted a formal evidentiary hearing at which Flores was present and represented by counsel. At the conclusion of the hearing, counsel for Flores moved to dismiss counts II and III of the formal charges and, therefore, only count I was submitted to the referee. The referee made the following factual findings with respect to count I:

Flores was admitted to the practice of law in the State of Nebraska on September 22, 1980. He was engaged in private practice in Hooper and Scribner, Nebraska with the law firm of Hurt & Gallant [sic] from September, 1980 through September, 1986. On October 4, 1986 he accepted a position at the First National Bank & Trust in Fremont, Nebraska, as a trust officer. This bank was subsequently sold to FirsTier and will hereinafter be referred to as "FirsTier". He left that position in May, 1994 and thereafter took time off from the practice of law. He is currently under "suspension" for failure to pay dues to the NSBA which was a voluntary act on his part as he did not intend to actively practice law for a while. He presently manages a greenhouse in Des Moines, Iowa, where he recently moved to be near his children who reside with their mother in eastern Iowa.

Erling started out at the age of 16 as a secretary at FirsTier and later became vice president. She was the first

female to hold an officer's position at any bank in Fremont, Nebraska.

Erling and FirsTier were designated as co-personal representatives of the Estate of Wilma Tiegler, a resident of Fremont, who died in an automobile collision in 1987. The Tiegler Estate proceeded through the probate process in the County Court of Dodge County, Nebraska. Erling and Flores worked together on the Tiegler Estate. This Estate was complicated and required years to complete its administration. In fact, as of the date of the hearing in this matter (June 8, 2000) administration of the Tiegler Estate was still in progress and the Estate had not yet been closed.

During the course of their work together on the Tiegler Estate, Flores and Erling developed a close, personal friendship. The scope of the relationship came to include Erling's friendship with Flores' then-wife, Julie Flores, and Flores' three young children.

After she retired from her full time employment at FirsTier in 1988, Erling continued to speak to and/or meet with Flores several times a week regarding her continuing work on behalf of the Tiegler Estate as well as personal and social matters. At her retirement ceremony, Flores was asked to be the emcee by the bank president even though the bank president had known Erling much longer than Flores had.

Erling was an only child and never married. She had no children. Flores described the bank as being her "family".

Flores and Erling had several things in common. They liked to go out to eat, attend civic events, and attend other social events. They both enjoyed art and music. Erling would oftentimes go to the Flores home and she traveled with Flores and his family on vacations, including a trip to the Plaza in Kansas City to see the Christmas lights.

Erling spent Christmas Eve and other holidays, as well as family celebrations such as birthdays and baptisms, with Flores and his family.

Erling always sent cards or gifts to the Flores children on days such as Halloween, Valentine's Day, Christmas and birthdays. She often commented about how fortunate she felt to be a part of the Flores family.

Between 1988 and 1992 Erling and Flores usually met for lunch twice a week, every week.

Flores was the one who would take Erling to the doctor, take her shopping, take her wherever she needed to go. This occurred on a regular basis. When she had to move out of her apartment, Flores took two weeks of vacation and spent the days and evenings cleaning out her apartment and boxing up her personal effects for storage. He stored all of Erling's personal effects either at his parents' home in Scribner, Nebraska, or at Denning Storage in Fremont, Nebraska. He used his parents' home to store the more valuable personal effects such as china, sterling, jewelry, silverware, etc. Flores testified that he paid all the storage expenses at Denning Storage.

In 1990, Erling told Flores that she had added his name to her checking account at FirsTier. In 1991, the two opened another joint checking account at First Federal of Lincoln ("First Federal"). During this same time frame Erling also placed Flores' name on four CDs as joint owner. Each of these CDs was approximately $10,000.00 in value. At this time, Erling's assets consisted of approximately $40,000.00 in CDs and a $10,000.00 car in addition to miscellaneous personal effects. The car was subsequently sold and the proceeds ($10,000.00) were placed in one of Erling's checking accounts. (Parenthetically, it is noted that the Stipulation between the parties identified three CDs with a total value of approximately $25,000.00).

When told that he had been added to the financial accounts Flores told Erling he was very grateful but she didn't have to do that. Her response was that Flores didn't have to do all that he did for her either but she truly appreciated it. He was uncomfortable about being added to these accounts so he went to Erling's friend and co-worker, Marilyn Anderson, and spoke to her about it. The specifics of that discussion were not revealed at the hearing.

Flores testified that both Erling and Flores had their own check books for the FirsTier account and that Flores maintained possession of the check book for the First Federal

account, while Erling maintained a cash card for that account.

The FirsTier monthly statement would go to Erling. Each month Flores would discuss with Erling all the checks cashed that month. The First Federal statements went to Flores. Flores testified that all monies spent out of either checking account or the CDs were spent with the full knowledge and consent of Erling.

When the CDs were cashed the proceeds were placed in one or the other checking account.

Of the approximately $50,000.00 in available cash from and after 1990, Flores estimated he spent $20,000.00 of it for his own personal benefit/use with the knowledge and consent of Erling. The remainder was spent on items requested by Erling or to pay bills on behalf of Erling. At one point in time, Erling was paying for three different residences - her home, an assisted living apartment, and the nursing home at Arbor Manor.

At the same time Erling advised Flores that she had named him as a joint owner of the checking and CD accounts, she likewise advised him that she had signed both a Durable Power of Attorney ("POA") naming him as her attorney-in-fact and a Living Will giving Flores the power and authority to make medical care decisions on her behalf if she became unable to participate in such decisions.

In addition, in August, 1991, Erling signed her Last Will and Testament wherein she made specific dollar amount bequests to nine different individuals totaling $7,000.00. The residual/remainder of her Estate was willed to Flores and, in the event he did not survive her, then to the Presbyterian Church in Fremont, Nebraska. Flores played no part in the preparation of this Will nor any of the other aforedescribed legal documents, nor was he aware of their existence until after they were prepared and signed.

Flores testified he never performed any legal work for Erling. Tom Thomsen ("Thomsen") did all of her legal work, including the Durable Power of Attorney, Living Will, and Last Will and Testament. Thomsen was also the attorney for FirsTier.

It was stipulated that if Thomsen was called to testify as a live witness at the hearing, he would state that he perceived Erling was competent and knew, understood and intended the nature and effect of her acts when she executed her Power of Attorney and Living Will documents. There was no other evidence to the contrary. I specifically find that Erling neither lacked testamentary capacity nor was she the subject of undue influence when she participated in the various activities detailed hereinabove (adding Flores to the checking accounts and CDs, and executing the POA, Living Will, and Last Will and Testament).

Regarding Erling's physical and mental health, Flores testified that in the latter part of 1991 and spring of 1992 he starting seeing a little "slipping", she became "a little forgetful". Examples he gave were misplacing her keys and not recalling immediately which day of the week it was when he would call her for lunch.

At that time, Flores and Erling shared the same physician. He inquired of the physician about her mental health and was told that the tests were "all right". Despite this, he took her to the Nebraska Geriatric Clinic for a second opinion and was again advised the tests were "all right".

Flores recalled that by the fall of 1992 Erling was not able to physically care for herself and it was stipulated that she was admitted to Arbor Manor, a nursing home in Fremont, Nebraska, in October of 1992. However, during this time he would still visit with her and she continued work on the Tiegler Estate while in the nursing home. It was sometime during 1994 that she was no longer able to handle her financial affairs by herself.

Flores acknowledged that from 1990 until the death of Erling (December 11, 1997) he expended more funds than he contributed to Erling's accounts. However, between 1993 and the end of 1995 he contributed about $9,000.00 more to the joint account than was taken out. This will be further explained infra and is detailed in Exhibit 54.

On or about February 16, 1993, Flores, on behalf of Erling, applied for Medicaid assistance with NDSS [Nebraska Department of Social Services]. Exhibit 4 is the

Application which Flores and/or the NDSS case worker filled out. On page 2 of Exhibit 4 Flores is twice identified as the POA for Erling. The signature page (last page of Exhibit 4) is signed by E. Edith Erling "by Jeff Flores". There is no mention of POA on that signature. The Application (Exhibit 4) does not contain a copy of the POA attached to it nor was there any testimony or other evidence that the POA was produced, used or required at the time Flores filled out the Application for Erling.

Flores acknowledged that he knew he was making the application based on the POA and because he was Erling's friend. He also testified that most everything he did for Erling he did without the use of the POA. I specifically find, however, based on his own testimony, that Flores was, at least in part, relying upon or utilizing the POA in his efforts to secure Medicaid funding for Erling.

. . . .

When Erling retired in 1988 her monthly income consisted of pension benefits and social security benefits. The monthly pension benefit amount at that time and thereafter was $502.28. The monthly social security benefits at the time Application was made with NDSS for Medicaid assistance was $1,001.00.

Flores testified that he had assisted in several applications to NDSS for Medicaid for others prior to the Application he made on behalf of Erling. The exact number was not revealed. It was also not revealed which of these occurred while he was in private practice and which occurred while he was a trust officer at the bank.

Flores acknowledged that it was his understanding that both the monthly social security payment ($1,001.00) and the monthly pension ($502.28) were to be applied to Erling's care at Arbor Manor. He later testified that he didn't believe there was any priority on the pension funds that ear-marked them for the Arbor Manor obligation.

The original mechanism for payment to Arbor Manor was that both the social security and the pension were paid into one of Erling/Flores [sic] joint checking accounts and then Flores wrote checks each month to Arbor Manor.

Sometime in 1995 the Social Security started being paid directly to Arbor Manor, presumably at the behest of Arbor Manor. However, the pension fund continued to be paid into the Erling/Flores checking account and then Flores wrote a check to Arbor Manor each month for the full amount of the pension payment. This was the procedure followed from and after Erling's admission to Arbor Manor (October, 1992) until December, 1995, at which time Flores ceased paying the $502.28 pension amount to Arbor Manor. As of December, 1995, he started paying that amount to himself. This practice of paying the pension amount to himself continued from December, 1995 through November, 1996, at which time Anderson was appointed guardian conservator by the County Court of Dodge County at the behest of NDSS. The conservatorship was represented by attorney Schneider.

The process of the pension and social security funds being paid directly into the checking account(s) started before Flores was put on the accounts as joint owner.

Attorney Schneider, an acquaintance and former classmate of Flores, received a phone call from Arbor Manor in about March, 1996, complaining it had not been paid the $502.28 pension payment since December, 1995. Schneider agreed to check into it but had difficulty contacting Flores. He eventually reached Flores at Flores' parents' home on Easter weekend, Saturday, April 6, 1996. At that time he advised Flores that he had been told the pension monies had not been paid for three or four months. He testified that Flores acknowledged to Schneider those payments had not been made and the reason they had not been made was because Flores had been "on the road" a lot and had not had time to make the payments.

Schneider suggested a couple of ways to make the payments in the future, including direct deposit to Arbor Manor. Flores rejected that idea but assured Schneider, according to Schneider, that he would go to FirsTier the following week and set up an automatic payment plan where the amount would be paid by the bank out of the FirsTier checking account directly to Arbor Manor on a monthly basis.

Schneider testified that it was very clear to him that Flores knew this money was supposed to be paid to Arbor Manor each month. I specifically find that Flores was aware that Arbor Manor was entitled to receive the $502.28 pension payment each month and further specifically find that he acknowledged that awareness to Schneider in April, 1976 [sic].

This matter of the unpaid pension amount then "drifted" according to Schneider for another six months or so, at which time the NDSS contacted him in November, 1996, asking that a conservatorship be set up because the pension money still was not being paid to Arbor Manor and had now gone unpaid for approximately twelve months.

Attorney Schneider is the one who filed the initial Complaint with the NSBA against Flores.

Flores acknowledged having the April 6, 1996 phone conversation with Schneider and agreed with Schneider's account of the conversation to the extent that they discussed the money owed Arbor Manor and the need to take care of it. However, he disagreed as to what he told Schneider about getting in contact with the bank. It was Flores' testimony he told Schneider he would contact the bank to get this paid. By that he meant he would contact the bank about getting the remaining Personal Representative (PR) fee due and owing to Erling from the Tiegler Estate to take care of the back pension monies due and owing to Arbor Manor. To that end, Flores called Jeff Denison, trust officer for FirsTier in Norfolk, Nebraska, and asked when the remaining PR fee for Erling could be expected. Flores testified he had earlier contacted Mr. Denison in December, 1995, and had been told the PR fee would be paid possibly in 1995 but, if not then, for sure in 1996. When Flores called Denison again in response to the phone call he had received from Schneider in April, 1996, Denison assured him Erling would get paid although this was somewhat contingent on the "crops coming in".

The Tiegler Estate was valued at $1.9 million. Erling had agreed to perform her co-personal representative duties at a charge of three-quarters of 1% ($14,250.00). To

date, it is believed Erling had received approximately $10,000.00 of that fee. That money was received in 1989 or 1990. The parties stipulated that the sum of approximately $5,098.00 is still owed to Erling and her Estate in unpaid PR fees.

Flores testified that he started taking the pension check for his own use in December of 1995 because he had paid a lot of bills on behalf of Erling over the previous two to three years out of his own personal funds and from money he borrowed from his parents. In December, 1995, he was operating under the belief that Erling was about to receive $5,000.00 to $6,000.00 in PR fees and he felt it was acceptable to recoup back some of what he had, in essence, "loaned" to Erling. He acknowledged that he never discussed with Erling the fact he was paying some of her bills with his personal funds nor the fact he was now taking her pension check to repay himself. Erling was never aware of this "loan".

Erling had previously suffered two falls, one in 1993 as a result of a thyroid condition, and one in 1994 as a result of which she broke her hip. In both instances she was hospitalized.

She had little or no insurance to pay the doctor and hospital bills and Flores took it upon himself to pay at least a portion of those for her. As noted above, he did not tell her he was making payments on these bills. He recalled that the first hospitalization totaled approximately $6,700.00 and the second hospitalization totaled more. At another point, he testified that the second hospitalization cost somewhere between $10,000.00 and $12,000.00. He did not pay all of her bills. Exhibit 54 is a recapitulation of what Flores paid into the joint checking account, the amount he took out, and some of the bills paid between 1993-1996 on behalf of Erling. The withdrawals are not individually identified.

Flores acknowledged that he was generally not employed in 1995 or 1996 and he was living primarily off of his pension plan from the bank and the sale of his Fremont home as a result of his divorce which was final-

ized in January, 1994, as well as some part time periodic employment.

Flores acknowledged he did not research his right to take the pension monies because he did not view it as anything related to an attorney/client relationship.

In addition to the above findings of fact, based upon clear and convincing evidence, I also make the following specific findings of fact, keeping in mind that I observed the demeanor of Flores throughout his testimony and the rest of the hearing. . . .

I believe and find, clearly and convincingly, that Flores truly cared for Erling and her well-being and that she felt the same toward him. With or without the POA, Flores would have done all that was within his power to secure the Medicaid funding for Erling.

I find that he had no ulterior motive for using his own and borrowed funds to help pay off Erling's medical bills and for making contributions to the joint account in 1993-95.

I further find that he was motivated solely by a genuine feeling of care for Erling to include her in his family and to give her the attention and assistance he did from and after approximately 1988.

I believe and find the relationship between Erling and Flores would have been the same over the years regardless of whether Flores' name had been added to the various financial accounts and regardless of the POA. I believe and find these two shared a very close relationship.

The referee concluded that the NSBA had proved by clear and convincing evidence that Flores violated DR 1-102(A)(1), (4), and (6), as well as the attorney's oath of office. The referee determined that Flores did not violate DR 1-102(A)(3). The referee recommended that Flores be suspended from the practice of law for 3 years.

## II. ASSIGNMENTS OF ERROR

In his timely exceptions to the referee's report and in his brief to this court, Flores asserts the referee erred in (1) finding there was " 'approximately $50,000 in available cash from and after 1990' " available to Flores from assets formerly owned solely by

Erling but to which she added Flores as a joint owner, (2) finding Flores relied upon or utilized his authority as Erling's power of attorney in assisting her to obtain medicaid assistance from the Nebraska Department of Social Services in February 1993, (3) finding Flores "knew" he had an affirmative duty to make monthly payments for Erling's benefit to Arbor Manor nursing home from a bank account titled jointly to Flores and Erling, (4) finding Flores' unexercised authority as Erling's power of attorney created an affirmative duty for Flores to ensure that Erling's nursing home bills were paid from the joint checking account, (5) finding Flores " 'appeared to recognize and accept the fact' " that Erling's pension benefits deposited in the joint account " 'rightly belonged to Arbor Manor,' " (6) finding Flores' actions regarding distribution of the funds in the joint account were " 'a matter of Flores retaking what he wrongfully felt was rightfully his,' " (7) finding Flores violated any provision of the Code of Professional Responsibility, (8) finding Flores is subject to discipline for actions which were not criminal or illegal and were not taken within the scope of an attorney-client relationship, and (9) finding Flores should be disciplined and recommending that he be suspended from the practice of law for a period of 3 years.

### III. STANDARD OF REVIEW

A proceeding to discipline an attorney is a trial de novo on the record, in which the Nebraska Supreme Court reaches a conclusion independent of the findings of the referee; provided, however, that where the credible evidence is in conflict on a material issue of fact, the court considers and may give weight to the fact that the referee heard and observed the witnesses and accepted one version of the facts rather than another. *State ex rel. NSBA v. Mefferd,* 258 Neb. 616, 604 N.W.2d 839 (2000); *State ex rel. NSBA v. Miller,* 258 Neb. 181, 602 N.W.2d 486 (1999). Disciplinary charges against an attorney must be established by clear and convincing evidence. *State ex rel. NSBA v. Mefferd, supra.*

### IV. ANALYSIS

For analytical purposes, we have summarized Flores' nine assignments of error into three: (1) the referee erred in finding

the factual allegations were proved by clear and convincing evidence, (2) the referee erred in concluding Flores is subject to discipline for actions which were neither criminal nor illegal and were not within the scope of an attorney-client relationship, and (3) the referee erred in recommending a 3-year suspension from the practice of law. We address each of these assigned errors in turn, recognizing that our review is de novo on the record. See, *State ex rel. NSBA v. Mefferd, supra*; *State ex rel. NSBA v. Miller, supra*.

## 1. CLEAR AND CONVINCING EVIDENCE TO SUPPORT FACTUAL FINDINGS

### (a) Finding That There Was $50,000 in Assets Available to Flores From and After 1990

The referee found that there was $50,000 in Erling's assets available to Flores from and after 1990. Flores argues that the evidence of Erling's assets was "limited and controverted," brief for appellant at 17, and that thus this finding was not based upon clear and convincing evidence. Flores testified that Erling showed him four certificates of deposit in early 1990, which he assumed to be in "fairly even denominations" of $10,000 each. He also testified that Erling owned a car in 1990, which was subsequently sold for $10,000. In contrast, the parties stipulated that Erling owned certificates of deposit with an approximate value of $25,000. There is thus some dispute in the record regarding the total sum of Erling's assets. Upon our de novo review, we find that the record clearly and convincingly establishes that Erling's assets totaled $35,000 in 1990, consisting of $25,000 in certificates of deposit and $10,000 from the sale of her car. We note, however, that this finding is not critical to our resolution of this appeal.

### (b) Finding That Flores Utilized Power of Attorney in Obtaining Medicaid Benefits on Behalf of Erling

The referee specifically found that Flores relied upon the power of attorney, at least in part, in seeking medicaid benefits on behalf of Erling. Flores asserts the evidence in the record does not support this finding. The application for medicaid benefits submitted on behalf of Erling is signed "E. Edith Erling by

Jeff Flores" and dated "02/16/93." In response to specific questions included in the application, Flores is identified as an individual acting under the power of attorney for Erling. The "For Office Use Only" portion of the application notes that "Identity" was established by "Insurance card" and "POA [power of attorney] papers." Moreover, on direct examination during the hearing before the referee, Flores admitted that he filled out the application form and further testified as follows:

> Q. And in making this application, you knew that you were doing this based on the power of attorney in which Ms. Erling had named you as her attorney-in-fact?
>
> A. Correct.
>
> Q. And you were also filling this out because she was a friend of yours, you were trying to help her out?
>
> A. Yes.

We conclude that there is clear and convincing evidence that Flores relied upon the power of attorney, at least in part, in seeking the medicaid benefits to be used for Erling's care at Arbor Manor and that thus the referee's finding is supported by the record.

### (c) Finding That Flores "Knew" He Had Duty to Make Payments to Arbor Manor From Joint Checking Account

The referee found that Flores clearly knew he had a duty to pay the pension benefits to Arbor Manor. Flores argues that the notice of medicaid award, exhibit 51, directed only that $1,429.28 from sources other than medicaid be paid to the nursing home for Erling's care. The notice did not dictate the source or sources from which this amount must be paid. He thus contends that the record does not establish that he "knew" the pension benefits were to be paid to the nursing home.

Schneider testified that Flores acknowledged his understanding that the pension benefits were to be paid to the nursing home. According to Schneider's testimony, there was no doubt about Flores' understanding of this matter. Although Flores testified that he did not think the pension benefits were specifically "ear-tagged" for the nursing home, it is undisputed that he indeed paid those funds to Arbor Manor for approximately 3

years. In addition, Flores testified that he understood both Erling's Social Security and pension benefits were to be applied to her account at Arbor Manor. We conclude that there is clear and convincing evidence that Flores knew that Erling's pension benefits were to be paid to Arbor Manor for Erling's care.

### (d) Finding That Flores' Unexercised Authority as Power of Attorney Created Duty to Pay Nursing Home Bills From Joint Checking Account

This assignment of error is not argued in Flores' brief to this court. Errors that are assigned but not argued will not be addressed by an appellate court. *Bowers v. Dougherty*, 260 Neb. 74, 615 N.W.2d 449 (2000). Moreover, as noted above, Flores acknowledged in his own testimony that he did in fact exercise his authority as Erling's power of attorney in applying for the medicaid benefits, and thus this assignment of error is without merit.

### (e) Finding Pension Benefits "Rightly Belonged" to Arbor Manor

Flores challenges the referee's "legal conclusion" that the pension benefits "rightly belonged" to Arbor Manor. He argues that while Arbor Manor was an unsecured creditor of Erling, he too was merely an unsecured creditor by virtue of the funds he advanced to help pay her health care bills. This argument ignores Flores' fiduciary relationship with Erling arising from his use of the power of attorney to obtain medicaid benefits for her care at Arbor Manor. Flores acted as Erling's agent in paying the monthly proceeds from her pension to Arbor Manor under the terms of the medicaid benefit award, for which he had applied on her behalf. As her agent, he was prohibited from profiting from the transaction or from having a personal stake in the transaction that was in conflict with Erling's interest. See *Fletcher v. Mathew*, 233 Neb. 853, 448 N.W.2d 576 (1989). Flores knew that Erling's medicaid benefits were conditioned upon $1,429.28 being paid to Arbor Manor each month, an amount representing the approximate total of her Social Security and monthly pension benefits. Flores paid the sums due to Arbor Manor for a period of 3 years and at all times knew the payments were to be made to Arbor Manor. Thus, there is clear

and convincing evidence that at least $1,429.28 of the Social Security and pension benefits received by Erling each month "rightfully belonged" to Arbor Manor.

### (f) Finding That Flores' Actions Were "Matter of Flores Retaking What He Wrongfully Felt Was Rightfully His"

With respect to this assignment of error, Flores argues that he committed no ethical impropriety in applying the pension funds to the repayment of Erling's debt to him due to his voluntary payment of certain of her medical bills. He also argues that the record does not establish that he utilized the power of attorney in applying for Erling's medicaid benefits. Because we have considered and determined that the record does establish that he did utilize the power of attorney in applying for the medicaid benefits, we need not readdress this issue. The issue of the ethical propriety of his conduct will be addressed below.

### (g) Conclusion

We conclude, based upon our de novo review of the record, that the evidence clearly and convincingly establishes that Flores relied upon the power of attorney at least in part in applying for Erling's medicaid benefits. We further conclude that Flores knew the $502.28 monthly pension benefits were to be paid to Arbor Manor and that he failed to do so during the 11-month time period at issue.

### 2. Is This Conduct Subject to Discipline?

Flores argues that even if his conduct was based in part upon the exercise of the power of attorney, such conduct cannot subject him to discipline under the code because the conduct did not occur within the scope of an attorney-client relationship and was neither criminal nor illegal in nature. The referee specifically found that the conduct at issue did not occur during the course of an attorney-client relationship. The referee did determine, however, that the conduct related, at least in part, to Flores' role as Erling's attorney in fact based upon the power of attorney. The issue presented is whether Flores' actions in these circumstances subject him to discipline.

A power of attorney authorizes another to act as one's agent. *Cheloha v. Cheloha*, 255 Neb. 32, 582 N.W.2d 291 (1998).

Generally, an agent is required to act solely for the benefit of his or her principal in all matters connected with the agency and adhere faithfully to the instructions of the principal. *Id.* An agent and principal are in a fiduciary relationship such that the agent has an obligation to refrain from doing any harmful act to the principal. *Id.* An agent is prohibited from profiting from the agency relationship to the detriment of the principal. *Id.*

In the instant case, Flores has established that he paid certain of Erling's medical bills from his own funds and intended to be reimbursed for his expenditures. He contends that he therefore was entitled to repay himself by utilizing the monthly pension benefits, which were paid into an account on which he was a joint owner. However, Flores' status as an unsecured creditor cannot and does not diminish his role as Erling's agent pursuant to the power of attorney. Once he utilized the power of attorney in seeking medicaid benefits for Erling, he was acting as her fiduciary with regard to those benefits and the conditions upon which they were awarded. Flores' decision to apply Erling's pension benefits to her "debt" to him rather than to her account at Arbor Manor enabled him to benefit from the agency relationship, in direct violation of his fiduciary duty. See *Cheloha v. Cheloha, supra.* In addition, his decision to discontinue paying the pension moneys to Arbor Manor, with full knowledge that the medicaid award was premised upon the payment of those sums to Arbor Manor for Erling's care, was an act that subjected Erling to potential harm, either in the form of eviction from the nursing home or discontinuation of medicaid benefits. The record therefore establishes that Flores' conduct violated his fiduciary duty to Erling.

Our prior case law has not limited conduct subject to discipline to that which occurs within the scope of an attorney-client relationship. See, *State ex rel. NSBA v. Douglas,* 227 Neb. 1, 416 N.W.2d 515 (1987); *State ex rel. Nebraska State Bar Assn. v. McConnell,* 210 Neb. 98, 313 N.W.2d 241 (1981). See, also, Neb. Ct. R. of Discipline 3(B) (rev. 1996), stating that acts or omissions which violate the Code of Professional Responsibility "shall be grounds for discipline whether the act or omission occurred in the course of an attorney-client relationship or otherwise." While Flores was not convicted of a crime and there is

no showing that his conduct was illegal, we find that his violation of a fiduciary duty nevertheless subjects him to discipline under the code.

The evidence reflects that between 1993 and 1996, the sum of the deposits Flores made into the joint account and the bills he paid for Erling from his own funds exceeded his withdrawals from the account by $3,696.40. Thus, this is not a case of theft or misappropriation of client funds, and we conclude that there is no clear and convincing evidence that Flores engaged in conduct involving moral turpitude, dishonesty, fraud, deceit, or misrepresentation. We therefore find no violation of DR 1-102(A)(3) or (4).

■ However, we conclude that Flores' breach of his fiduciary duties as attorney in fact for Erling, as discussed above, constituted conduct that adversely reflected on his fitness to practice law and therefore violated DR 1-102(A)(6), which also constitutes a violation of DR 1-102(A)(1). The relationship between an attorney and client is one of the highest trust and confidence such as to require the attorney to observe the utmost good faith and not to allow the attorney's private interests to conflict with those of the client. *Bauermeister v. McReynolds*, 254 Neb. 118, 575 N.W.2d 354 (1998). Canon 5 of the Code of Professional Responsibility adopted by this court requires a lawyer to exercise independent professional judgment on behalf of a client. EC 5-1 states:

> The professional judgment of a lawyer should be exercised within the bounds of the law, solely for the benefit of the lawyer's client and free of compromising influences and loyalties. Neither the lawyer's personal interests, the interests of other clients, nor the desires of third persons should be permitted to dilute the lawyer's loyalty to his or her client.

EC 5-3 provides in part:

> The self-interest of a lawyer resulting from the lawyer's ownership of property in which his or her client also has an interest or which may affect property of the client may interfere with the exercise of free judgment on behalf of the client. If such interference would occur with respect to a prospective client, a lawyer should decline employment

proffered by him or her. After accepting employment, a lawyer should not acquire property rights that would adversely affect the lawyer's professional judgment in the representation of his or her client. Even if the property interests of a lawyer do not presently interfere with the exercise of the lawyer's independent judgment, but the likelihood of interference can reasonably be foreseen by him or her, a lawyer should explain the situation to his or her client and should decline employment or withdraw unless the client consents to the continuance of the relationship after full disclosure.

As noted, Flores' decision to use Erling's pension benefits to reimburse himself instead of making her required payments to Arbor Manor subjected Erling to potential if not actual harm. Although this conduct did not occur in the context of an attorney-client relationship, it nevertheless reflects adversely upon Flores' fitness to practice law because it calls into question his ability to subordinate his personal interests in order to exercise independent judgment on behalf of a client. Accordingly, there is a violation of DR 1-102(A)(6) which warrants discipline.

### 3. DISCIPLINE TO BE IMPOSED

To determine whether and to what extent discipline should be imposed in a lawyer discipline proceeding, this court considers the following factors: (1) the nature of the offense, (2) the need for deterring others, (3) the maintenance of the reputation of the bar as a whole, (4) the protection of the public, (5) the attitude of the offender generally, and (6) the offender's present or future fitness to continue in the practice of law. *State ex rel. NSBA v. Rothery*, 260 Neb. 762, 619 N.W.2d 590 (2000); *State ex rel. NSBA v. Howze*, 260 Neb. 547, 618 N.W.2d 663 (2000). For the purpose of determining the proper discipline, we consider the respondent's acts both underlying the events of the case and throughout the disciplinary proceeding. *State ex rel. NSBA v. Jensen*, 260 Neb. 803, 619 N.W.2d 840 (2000). The determination of an appropriate penalty to be imposed on an attorney also requires consideration of any mitigating factors. *State ex rel. NSBA v. Freese*, 259 Neb. 530, 611 N.W.2d 80 (2000). Each attorney discipline case must be evaluated individ-

ually in light of its particular facts and circumstances. *State ex rel. NSBA v. Jensen, supra.* In addition, the propriety of a sanction must be considered with reference to the sanctions imposed in prior similar cases. *State ex rel. NSBA v. Rothery, supra*; *State ex rel. NSBA v. Howze, supra.*

The record supports the referee's finding that the relationship between Erling and Flores was genuinely based upon mutual friendship of substantial duration. This relationship should be considered in determining Flores' discipline. See *State ex rel. NSBA v. Gilroy*, 240 Neb. 578, 483 N.W.2d 135 (1992). In addition, we consider the facts that Flores' conduct was not unlawful·and did not subject Erling to actual loss or harm. Further, the record reflects that Flores was generally cooperative and forthcoming in his dealings with the Counsel for Discipline in these proceedings, and he has had no prior disciplinary violations.

In several cases involving a lawyer's conduct occurring outside the attorney-client relationship which did not constitute a misappropriation of funds, we have imposed a 6-month license suspension. See, *State ex rel. NSBA v. Schleich*, 254 Neb. 872, 580 N.W.2d 108 (1998) (respondent installed listening device on wife's telephone, unrelated to attorney-client relationship); *State ex rel. NSBA v. Caskey*, 251 Neb. 882, 560 N.W.2d 414 (1997) (respondent knowingly failed to pay corporate payroll taxes over period of months, unrelated to attorney-client relationship); *State ex rel. Nebraska State Bar Assn. v. Butterfield*, 169 Neb. 119, 98 N.W.2d 714 (1959) (respondent, acting as notary public, falsely certified that his cousin personally acknowledged execution of deed). We conclude that a 6-month suspension is the appropriate disciplinary sanction in the present case.

We note that Flores' license to practice law is currently under nondisciplinary suspension for nonpayment of annual dues and assessments. Under article III, paragraph 5, of the Rules Creating, Controlling, and Regulating Nebraska State Bar Association adopted by this court, "[w]henever a member suspended for nonpayment of dues and/or assessments shall make payment of all arrears, and shall satisfy the Supreme Court of his.or her qualification to then return to the active practice of law, such member shall be entitled to reinstatement upon request." In order that it have meaning, the 6-month disciplinary

suspension which we impose herein will be added to Flores' current nondisciplinary suspension. Flores will therefore not be eligible for reinstatement until 6 months after he has paid all delinquent dues and assessments, submitted proof of compliance with Neb. Ct. R. of Discipline 16 (rev. 2001), and paid the costs of this proceeding which are hereby taxed to him.

## V. CONCLUSION

For the reasons stated, we find in our de novo review that Flores should be suspended from the practice of law for a period of 6 months immediately following the date when he becomes otherwise eligible for reinstatement from his current nondisciplinary suspension for nonpayment of dues and assessments.

JUDGMENT OF SUSPENSION.

MILLER-LERMAN, J., not participating.