**LILA PEFU POMARE, KAISARA PEFU,
and ASAUA FUIMAONO, Plaintiffs,**

v.

**ANISI PEFU and OTHERS, Defendants.**

High Court of American Samoa
Land and Titles Division

LT No. 18-00

September 20, 2001

Before RICHMOND, Associate Justice, and LOGOAI, Chief Associate Judge.

Counsel: For Plaintiffs, Asaua Fuimaono
For Defendants, S. Salanoa Aumoeualogo

## OPINION AND ORDER

On November 20, 2000, plaintiffs Lila Pefu Pomare ("Lila"), Kaisara Pefu ("Kaisara"), and Asaua Fuimaono ("Asaua") filed this action to enjoin defendant Anisi Pefu ("Anisi") from completing the construction of a new building until the court can determine the parties' rights in the underlying land. The complaint also seeks to void a trust agreement, executed by Pefu Fania ("Pefu"), which provides Anisi with control over the land; to require Anisi to restore about $18,000 of Pefu's funds; to judicially recognize a deed of a portion of the land by Pefu to Asaua; and to divide the rest of the land among Pefu's four children.

Pefu's four children include two sons, Kaisara and Anisi, and two daughters, Lila and Rasela Pefu ("Rasela"). Asaua and Pefu also have a blood relationship—a brother of Pefu's mother is Asaua's grandfather.

A hearing was scheduled on December 7, 2000, on the Court's order to Anisi to show cause why he should not be preliminarily enjoined pending the Court's final decision in the action from further construction of the building, exercising ownership rights in the land, expending funds from sales of the land, and evicting Lila or her siblings from Pefu's present

house on the land and the land. The hearing was postponed several times—to permit Anisi further time to obtain counsel, afford his counsel time to prepare, and accommodate hearing schedules—and was held on February 9, 2001, with the parties and their counsel present. During this interim, we enjoined Anisi from engaging in further construction of the building.

We heard testimony and received other evidence on February 9 and 12, March 12, and May 22, 2001. In the process, we invoked T.C.R.C.P. 65 and consolidated the hearing on the preliminary injunction application with the trial on the merits.

## Discussion

### A. Land at Issue

The particular land at issue is a portion of approximately 8.898 acres, named "Mosooi," located in the Village of Ili'ili, American Samoa. The 8.898 acres was the subject of extensive litigation between Pefu, his brother Sipili Atualevao ("Sipili") and his nephew Atoa Atualevao ("Atoa"), Sipili's son. The decisions in *Fania v. Sipili*, 14 A.S.R.2d 70 (Land & Titles Div. 1990) and LT No. 38-91 (Land & Titles Div. Oct. 21, 1992) (order on application for partition), are quite relevant to the present action. Thus, we take judicial notice of and begin by reviewing these past actions.

### B. Previous Litigation

We first summarize the findings in *Fania,* 14 A.S.R.2d 70. Pefu began to clear a portion of the 8.898 acres in the 1950s. In the 1960s, Pefu permitted Sipili to go on the land, and Sipili and Atoa cultivated the cleared area. During Pefu's absence on a missionary assignment to Swains Island from 1968 to 1973, Sipili and Atoa extended the cleared area. After Pefu's return, conflicts arose over claims to the land but were temporarily resolved until Pefu initiated *Fania* in 1989.

Pefu surveyed 7.567 acres of the cleared land in 1975. Apparently, however, Sipili and the family *sa'o* ("head chief") prevailed on him not to register the land. Then, in 1979, Sipili offered to register as his individually owned land his survey of 2.05 acres within the cleared land. Atoa objected, claiming that the land was communal land of Pefu, Sipili, and himself. Upon mediation at the Office of the Secretary of Samoan Affairs, it was agreed that Sipili would withdraw his registration offer, the land would be registered in the names of Pefu, Sipili, and Atoa, and then equally divided among the three of them. This agreement was not, however, carried out.

Next, in 1981, Atoa attempted to register Pefu's 1975 survey as his individually owned land. Sipili objected, complaining of his son's disobedience and claiming that he cleared the land first. Again, after mediation at Samoan Affairs, the issue was settled by Atoa withdrawing his registration offer. Then, in 1983, Sipili offered to register as his individually owned land his survey of 8.67 acres of the cleared land. This time Pefu objected, citing his many years of working the land. He withdrew his objection, claiming that he and Sipili settled their differences, but allowed the title to be registered in Sipili's name alone. In 1985, Sipili persuaded the Territorial Registrar to amend the registration to show that he and Atoa owned the land in common by misrepresenting that Atoa was an original co-applicant for the 1983 registration offer.

Pefu withdrew his objection to Sipili's registration offer in 1983 with Atoa's assurance that the 8.67 acres would be divided between Sipili, Atoa, and himself. He was unaware of the amendment adding Atoa as an owner with Sipili. In fact, he continued to have free access to the land, constructed a house there with Sipili signing the building permit, and believed the three-way division of the land was in process. He did not discover the actual status of the land until he learned that Atoa was selling parcels of the land without his knowledge and consent. During a verbal altercation in 1989, Atoa told Pefu that Pefu had no interest in the land. Pefu then commenced *Fania*, 14 A.S.R.2d 70.

The Trial Court in *Fania* found that Sipili and Atoa fraudulently deprived Pefu of his title in the 8.67 acres and imposed a constructive trust on the proceeds from sales of the land and on the remaining acreage to correct the unjust enrichment resulting from the fraud. 14 ASR 2d at 76-77. The Court also permanently enjoined further sales of the land without Pefu's consent, and directed the Territorial Registrar to reregister the title to the land in the names of Pefu, Sipili, and Atoa as tenants in common to reflect their original agreement on ownership. *Id.* The Appellate Division affirmed this decision. *See generally Sipili v. Fania*, 17 A.S.R.2d 96 (App. Div. 1990).

The *Fania* Trial Court left any division of the proceeds from the land sales and of the remaining land to Pefu, Sipili, and Atoa. However, they failed to amicably settle these matters, and in 1991, Pefu commenced LT No. 39-91 to require partition of the tenancy in common. Lengthy efforts, including those promoted by the Court, still did not result in voluntary resolution of the issues. Thus, by order entered on October 21, 1997, the Court imposed a solution. Under this order, Pefu was awarded 2.647 acres of the cleared land. The full size of the cleared land was 8.898 acres under the survey then before the Court. Sipili and Atoa were given the remaining land as tenants in common, subject to existing

encumbrances and other rights of third parties. In addition, Sipili and Atoa were held jointly and severally liable to Pefu in the sum of $18,032.80, plus 6% post-judgment interest, as Pefu's share of the proceeds from the prior land sales. The parties were also ordered to obtain at their own expense legal descriptions for registration of their allotted parcels. The stage was then set for the current legal controversy.

## C. Current Controversy

In the first place, lacking a complete legal description, Pefu has never registered the 2.647 acres awarded to him. Likewise, Sipili and Atoa have not registered the portion awarded to them as tenants in common. This lack of proper follow-up, for whatever reasons, appears to be habitual of the parties to the present action as well as the feuding relatives in the earlier actions.

On March 15, 1990, two days after the decision in *Fania* was entered, Pefu executed an affidavit expressing his intent to convey to Asaua at least a half-acre within the 8.67 acres. Pefu's affidavit stated that he wanted to reward Asaua for his financial and moral support and legal advice in winning a share of the land. Asaua is an attorney. He testified that, as Pefu's relative, he provided Pefu cash, food and other items from time to time, and arranged for Pefu's legal representation in the 1989 land case. It is also stated in the affidavit that, in the immediate presence of Asaua and Kaisara, Pefu had already pointed out the location of the half-acre to be conveyed. Lila was aware of Pefu's action, but she was in the nearby house at the time and did not directly witness Pefu's designation of land for Asaua. Though Pefu's 2.647 acres were still not precisely defined, the identified half-acre was near the house where Pefu lived and still lives and was well within the apparent location of Pefu's 2.647 acres. Asaua testified to this demonstration.

According to Asaua, a half-acre was surveyed in February 1991 pursuant to Pefu's instructions. On March 1, 1991, Pefu executed a deed conveying the half-acre to Asaua. Asaua knew as an attorney, of course, that he could not register his title to the half-acre until the title to Pefu's 2.647 acres was registered as Pefu's individually owned land. Asaua did not vigorously pursue the registration issue until now. He testified that he felt unwelcome at Pefu's house after Anisi, Pefu's eldest son, returned to American Samoa in 1995. He had, in 1994, prepared Pefu's power of attorney giving Kaisara authority to conclude the pending litigation and perfect the title to Pefu's 2.647 acres. Otherwise, however, he let the matter languish until the present situation arose last year.

Anisi was a career soldier, having enlisted in the U.S. Army in 1974 and retired in 1995. He regularly provided support from his military pay for

246

his parents when both were living and then for his father after his mother died. It is evident that upon his return in 1995, he took over care of Pefu's personal needs, though not by any means exclusive of the contributions of Kaisara and particularly Lila. Anisi did, however, take control of Pefu's affairs. In addition, friction developed between Anisi on one hand and Kaisara and Lila on the other, and the alienation remains in the picture.

Anisi either was unaware of or disregarded the power of attorney given to Kaisara. He certainly knows of this document now and testified that, not long after his return in 1995, Pefu told Anisi that he did not trust Kaisara, feared that Kaisara would sell his 2.647 acres, and wanted Anisi to handle all of his affairs.

 Kaisara claimed that he wanted to avoid further confrontation with Anisi, and he moved to Hawaii, at least in part for this reason, where he has lived since the mid-1990s. . By his relocation to Hawaii, Kaisara voluntarily abandoned his authority to act for Pefu under the 1994 power of attorney—having left on his own accord, Kaisara's power of attorney was effectively terminated and could not be restored without Pefu executing a new power to him. *See Fletcher v. Matthew*, 448 N.W.2d 576, 581 (Neb. 1989) (power of attorney creates an agency relationship); *Prezier v. Dudley*, 314 P.2d 138, 144 (Cal. App. 1957) (an agent who abandons the principle or his duties as an agent has terminated the agency relationship); 3 AM. JUR 2D *Agency* § 49 (2000) (an agent conducting himself in a manner incompatible with his duties as an agent can be found to have willfully terminated the agency relationship).

Anisi also treated Lila at least irreverently. In 1994, Lila took Pefu to the states for a visit lasting approximately a year. Not long after she and Pefu returned, Anisi compelled Lila to leave the home on the 2.647 acres where she was living with him and Pefu. Lila attributed Anisi's conduct to his disrespect of her religious practices, but he claimed that she irresponsibly disregarded his instructions on housekeeping and Pefu's personal care. There have been at least two other occasions of similar sparring, the latest occurring last year. Anisi also refused to participate in Lila's recent wedding. She now lives with her husband in another structure within the 2.647 acres. During the trial, Anisi also falsely intimated that Pefu was not Lila's natural father.

We have no doubt that each of the three siblings contributed to the estrangement between Anisi on one side and Lila and Kaisara on the other. However, based on their demeanor throughout the trial, it is apparent that Anisi has a strong adversarial attitude towards his sister and brother and was the principal antagonist in causing the continuing rifts among them.

In this background of strained relationships, the cause of the present litigation erupted in 2000. Anisi started to construct a house apparently within the half-acre that Pefu conveyed to Asaua in 1991. Lila, Kaisara, and Asaua then learned of other actions taken by Anisi.

First, on April 10, 1998, Pefu, as grantor, and Anisi, as trustee, signed a trust agreement. Under this agreement, title to the 2.647 acres, improvements on the land, and the furniture and furnishings in Pefu's home were transferred to Anisi. Relevant to this action, Anisi, as trustee, must pay any income derived from the trust to Pefu for life, and may apply the principal of the trust as Anisi, in his discretion, deems necessary to provide for Pefu's support. In essence, Anisi was given full authority to enter transactions regarding the 2.647 acres within the parameters of this direction for Pefu's care. Anisi testified that the attorney who prepared the trust agreement explained in the Samoan language all the terms of the agreement to Pefu, and that Pefu understood the terms. Although, on May 28, 1998, the Attorney General advised the Territorial Registrar to withhold registration of the trust agreement until the 2.647 acres was registered, the trust agreement was recorded on November 18, 1999. We have no evidence on the reason the Registrar disregarded the Attorney General's recommendation.

Second, on January 6, 2000, Pefu signed a power of attorney giving Anisi broad authority to conduct Pefu's affairs, including transactions affecting the 2.647 acres. Anisi testified that this power of attorney replaced one that Pefu gave him upon his return in 1995 so that Anisi rather than Kaisara would handle Pefu's affairs. Anisi testified that the second power of attorney was necessary because the first one became wet and unreadable.

Third, on August 22, 2000, Pefu signed a warranty deed conveying to Anisi 0.133 of an acre, ostensibly within Pefu's 2.647 acres. The 0.133 of an acre appears to be substantially within the one-half acre that Pefu deeded to Asaua in 1991. Anisi testified that the house he had under construction on the 0.133 of an acre would be Pefu's new home for the rest of his life. Anisi claimed that he made plans to build this house even before he retired, and that after returning in 1995 he discussed his plans with Pefu, who then approved this project.

Lastly, Sipili or Atoa, or both of them, paid to Anisi the $18,032.80 that the court required them to pay Pefu as his share of the proceeds of sales of portions of the 8.898 acres prior to the Court's order of October 21, 1997. There is no evidence on whether or not the amount actually given to Anisi included the amount of the 6% interest accruing after October 21, 1997. Anisi testified that he spent $6,000 to repair a vehicle Anisi owns but was imported for Pefu's use, $6,000 to repair Pefu's house, and

248

most of the balance on family affairs, emergencies, and attorney's fees. He did not recall if any amount remained unexpended. Anisi claimed that Pefu wanted to buy a new vehicle, but Anisi felt that other needs had priority. Anisi denied contracting for the sale of any portions of the 2.647 acres and receiving funds from any such transactions.

Pefu's mental state when he entered these recent contractual transactions is of serious concern. Evidence is present that Pefu lacked the mental capacity to contract or was unduly influenced, or both, when he signed the trust agreement naming Anisi as trustee, made Anisi his attorney in fact, and conveyed the 0.133 of an acre to Anisi.

D. Mental Incapacity to Contract

 Mental capacity to contract is presumed until it is proven by a preponderance of evidence that actual unsoundness of mind existed at the time of contractual act. 53 AM.JUR.2D *Mentally Impaired Persons*, § 5 at 161 (1996). The legal standard is whether the person fully understood the nature, purpose, and effect of the particular transaction. *Id.* at 160.

Pefu is now about 88 years of age. When *Fania* was an active action during 1989 and 1990, Pefu was apparently in reasonably good mental health. Asaua and Kaisara supported that action and, based on age alone—then about 77 years—we do not doubt that Pefu required some encouragement and assistance to pursue that action successfully. However, Pefu testified during the trial in January 1990. His signatures on documents in the Court's *Fania* file appear to be clear and firm. Nothing in the court records suggests that Pefu's mental condition had significantly deteriorated before or during the course of the proceedings in *Fania*.

Similarly, the evidence does not show any marked degeneration in Pefu's mental faculties when he signed the affidavit expressing his intent and reasons for conveying the one-half acre to Asaua in 1990 or when he signed the deed carrying out that intent in 1991. Likewise, the evidence indicates that Pefu remained mentally alert when he commenced LT No. 38-91 to partition the 8.898 acres later in 1991. It may be noteworthy that while Pefu was present during the trial of LT No. 38-91 in October 1997, he did not testify. Anisi was then Pefu's only lay witness on personal and family matters. The decision not to have Pefu testify may have been solely trial tactics. On the other hand, it may confirm other evidence of Pefu's lessening acumen during the intervening and subsequent years.

It is noteworthy that Pefu's signature has degenerated over time. His signatures affixed to the power of attorney to Kaisara in 1995, trust

agreement in 1998, and especially to the power of attorney and deed to Anisi in 2000, while legible, are visibly shaky. The gradual deterioration is evident.

The testimonial evidence on Pefu's mental state is directly conflicting. Pefu's children did agree that Pefu suffers from loss of hearing. It appears that this condition started to develop many years ago. At one time, Pefu used a hearing aid, but apparently he has refused to use one for some years, perhaps since 1995 or so. Anisi and Rasela Pefu, another sister, said that Pefu can read lips. Lila stated that Pefu does not understand what others are saying to him unless the message is written and simple. In any event, the siblings usually communicate with Pefu by writing notes, using sizeable printed letters.

Lila testified that beginning in 1995, Pefu became very deaf and showed signs of senility that is characterized today by repeated and random statements, misconception of communications, walking about aimlessly, and similar inappropriate behavior. She also asserted that Anisi yells and swears at Pefu, and Pefu now fears Anisi. Anisi denied that Pefu fears him and claimed he has always treated his father with utmost respect.

Anisi testified that he usually communicates with Pefu by means of written notes that Pefu understands. He also said that Pefu knows where he is when they drive around the island, knows what he is eating, uses the bathroom properly, though he takes about two hours to shower, can read Anisi's lips, and is otherwise aware of immediate circumstances. Anisi emphasized that he, not Lila, is constantly taking care of Pefu. Lila pointed out, however, that after Anisi returned in 1995, he was enrolled at the American Samoa Community College for awhile, frequently played golf, and was off-island due to illness for about a month, during which times she was Pefu's primary caretaker. She also pointed out that Anisi spends considerable time in such activities as playing golf and bingo. Lila insisted that Anisi prevents her from helping more with Pefu's care, and when she and Anisi are together, Anisi is frequently contentious with her.

Rasela, Lila's and Anisi's sister, gave her opinion that Pefu needs close attention and is forgetful due to his elderly age, but that he is still aware of his surroundings, eats and bathes without much help, and responds appropriately to written notes. She confirmed that Pefu also can read lips. She also indicated that Pefu did not attend the trial because he experiences back pains if he sits too long and was not well in general. To Rasela's knowledge, Anisi has never mistreated Pefu. She believed that Pefu trusts Anisi.

Beginning at least in 1995, Pefu has manifested signs of progressive

mental deterioration associated with old age, commonly referred to as senile dementia when unsoundness of mind sets in. *See* 10 AM. JUR. PROOF OF FACTS 374-77 (1961). The evidence does not, however, sufficiently preponderate to establish that Pefu's mental condition reached the stage of actual incompetency at the time he favored Anisi with a power of attorney in 1995, the trusteeship in 1998, and a second power of attorney and the land deed in 2000. It appears that Pefu was fully aware of and understood the nature and effect of those transactions.

### E. Undue Influence

■ As a general rule, the making of a contractual transaction is presumed free of undue influence until it is established by a preponderance of evidence that unfair persuasion was actually exerted. 25 AM. JUR. 2D *Duress and Undue Influence* § 38 (1996). A presumption of undue influence arises, however, when the parties to an improvident transaction have a confidential or fiduciary relationship. *Id.* Once interjected, the presumption can be rebutted only by clear and convincing evidence. *Id.* at § 40. The legal standard is whether the questioned act was done by a person who had lost his free will and would not have entered the transaction but for another imposing compulsion. *Id.* at § 30.

■ The parent-child relationship can constitute the type of confidential relationship necessary to show undue influence. *Id.* at § 38; 13 A.L.R.3d 381 (1998). The situation in this case is fairly characterized in this manner. Clearly, Anisi returned from military service bound and determined to take over his father Pefu's personal care and affairs, essentially to the exclusion of his siblings Lila and Kaisara. Undoubtedly, Anisi was motivated by good intentions and had in mind Pefu's best interests. However, when Anisi unilaterally took on this role in Pefu's life, he necessarily assumed Pefu's confidence and a mantle of fidelity in the conduct of Pefu's affairs.

Anisi systematically went about solidifying his authority over Pefu and his affairs. The power of attorney in 1995, immediately substituting Anisi for Kaisara as Pefu's attorney in fact, the trust agreement in 1998 giving Anisi as the trustee further authority over Pefu's 2.67 acres and other property, and the second power of attorney in 2000, ostensibly replacing the physically spoiled first power of attorney, attest to his efforts. Using his authority, Anisi then, also in 2000, obtained Pefu's signature to the deed of 0.133 of an acre to Anisi without any monetary consideration.

Under these circumstances, a presumption of undue influence unfolds with respect to all four transactions, the two powers of attorney, trust

agreement, and land deed. Even without the presumption, however, it is readily apparent that Anisi used undue influence to gain Pefu's acquiescence to these transactions. Though we find that Pefu had not totally lost his mental competency at the time of any of the four transactions, Pefu had clearly reached a stage of mental and physical weakness due to his advancing age. Pefu lacked independent advice and was vulnerable to external pressures and unfair persuasion. Anisi was singularly focused on controlling Pefu's life and used his domineering personality to secure his objectives.

■ We hold that Pefu was unable to resist Anisi's oppressive insistence and entered the four transactions as a result of Anisi's undue influence. The remedy to cure the unjust consequences of undue influence is to undo the transactions. 1 B.E. WITKIN, SUMMARY OF CALIFORNIA LAW Contracts § 423 (9th ed. 1987). We therefore rescind the four transactions, the power of attorney in 1995, trust agreement entered on April 10, 1998, second power of attorney granted on January 6, 2000, and the land deed executed on August 22, 2000.

F. 1991 Land Deed and Unfinished House

■ Strictly, Pefu as a tenant in common with Sipili and Atoa had no legal right, without the co-tenants' consent, to convey to Asaua any specific or distinct portion of the 8.67 acres in 1991. 20 AM. JUR. 2D Cotenancy and Joint Ownership § 107 (1995). However, as an equitable principle, title to a tract of land held jointly may still inure to the grantee of such a conveyance in the event the tract is partitioned to the grantor in subsequent proceedings and if recognition of the prior conveyance can be done without prejudice to the other co-tenants. See Seavey v. Green, 1 P.2d 601, 603 (Or. 1931); Annotation, Grant of Part of Cotenancy Land, Taken from Less Than All Cotenants, as Subject of Protection through Partition, 77 A.L.R.2d 1376 (1961). If the half-acre conveyed to Asaua lies within the Pefu's partitioned 2.647 acres, as appears to be the case, we do not find prejudice to Sipili and Atoa or any other impediment to equitable recognition of the transfer in light of the judicial partition in 1997.

■ Anisi claims that he intends to provide Pefu with a new home for remainder of Pefu's life in the house under construction within the rescinded deed of 0.133 of an acre unjustly transferred to Anisi. The unfinished house also appears to be within the half acre deeded to Asaua on March 1, 1991. Construction of the house is well along to completion, and under the circumstances, it may be inappropriate and unnecessary to fully thwart Anisi's intent. It appears that Asaua's half-acre can be resurveyed and relocated within Pefu's 2.647 acres outside of the new house site. We will, therefore, further enjoin the construction of the new

house only long enough to complete the survey work described below and determine the feasibility of mutually accommodating both the new house site and the half-acre within Pefu's 2.647 acres.

G. Restitution

We are unable to satisfactorily ascertain, on the basis of Anisi's imprecise accounting, and lack of any other definitive evidence, whether Anisi expended for his own devices some portions, and if so how much, of the $18,032.80 paid to him by Sipili or Atoa as Pefu's share of the proceeds from previous sales of parcels within the 8.67 acres. We are satisfied that Anisi spent some of the funds for selfish ends. However, it is probably a practical impossibility at this juncture without any retained records to order Anisi to provide an adequate accounting or any other means to fix an amount of restitution for improper expenditures.

We will, therefore, only require Anisi to obtain, at his expense, from L.P. French, the professional surveyor who did the survey work prerequisite to the partitioning in LT No. 39-91, the completed legal description necessary to record Pefu's 2.647 acres as directed by the court's partition order of October 21, 1997. The survey shall also depict the location of the new house under construction and surrounding 0.133 of an acre, and the potential relocation of the one-half of an acre conveyed to Asaua within the 2.647 acres but outside of the 0.133 of an acre. This survey work must be done expeditiously.

**Order**

1. The power of attorney granted by Pefu to Kaisara in 1994 is terminated

2. The power of attorney granted by Pefu to Anisi in 1995, the trust agreement entered on April 10, 1998, under which Pefu designated Anisi as trustee having management and control of Pefu's 2.647 acres and other property, the power of attorney granted by Pefu to Anisi on January 6, 2000, and the deed of August 22, 2000, under which Pefu gave 0.133 of an acre within Pefu's 2.647 acres to Anisi are rescinded.

3. Pefu's deed a half-acre to Asaua, to the extent it is within Pefu's 2.647 acres, is valid.

4. Anisi shall, at his expense, employ professional surveyor L.P. French to complete the previously undertaken survey work and legal description necessary for recording with the Territorial Registrar of Pefu's 2.647 acres. The completed survey shall depict the location of the new house under construction and surrounding 0.133 of an acre, the location of the

half-acre conveyed on March 1, 1991, by Pefu to Asaua, and the potential location of the resurveyed half-acre within the 2.647 acres but outside of the 0.133 of an acre. The survey shall be completed, paid for, and filed with this court within 120 days of the entry of this order. Upon receiving the completed survey, the court will schedule a hearing to consider further appropriate orders in this action.

5. The temporarily enjoined construction of the new house is now permanently enjoined until further order of the court.

6. The Clerk of the Court shall cause this opinion and order to be served on the Territorial Registrar.

It is so ordered.